UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

14 JAN 15  PM 4: 06

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| CATHERINE KUHN,<br>MYCHELLE CASEL;<br>BRYAN STROHM,<br>SHAUN BOOKER:<br>LESTER ROGERS;<br>Individually and on behalf of<br>others similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>ASSET ACCEPTANCE CAPITAL CORP.;<br>ASSET ACCEPTANCE LLC;<br>ASSET ACCEPTANCE RECOVERY<br>SERVICES LLC;<br>LEGAL RECOVERY SOLUTIONS LLC;<br>ENCORE CAPITAL GROUP INC.<br>RION B. NEEDS;<br>REID E. SIMPSON;<br>DEBORAH L. EVERLY;<br>AAC QUAD-C INVESTORS LLC;<br>QUAD-C MANAGEMENT INC.<br>HEARTLAND ADVISORS INC.;<br>THE D3 FAMILY FUNDS LP;<br>NIERENBERG INVESTMENT<br>MANAGEMENT CO.<br>and JOHN DOES 1-50.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**1 : 14 -cv- 0059 TWP -DML**<br>Civil Action No.:<br>CLASS ACTION<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT SEEKING DECLATORY AND EQUITABLE RELIEF AS WELL AS ACTUAL AND STATUTORY DAMAGES AND DISGOREMENT OF FUNDS WITH JURY DEMAND

On behalf of the putative class, Plaintiffs, CATHERINE KUHN, MYCHELLE

CASEL, BRYAN STROHM, SHAUN BOOKER, and LESTER ROGERS by their

attorneys, for their Complaint against Asset Acceptance Capital Corp. ("AACC"),

Asset Acceptance LLC ("Asset"), Asset Acceptance Recovery Services LLC ("AARS"),

Legal Recovery Solutions LLC ("LRS") and Encore Capital Group Inc. ("Encore")

(collectively "Corporate Defendants"), and Rion B. Needs, Reid E. Simpson, and

Deborah L. Everly (collectively "Individual Defendants"), and AAC Quad-C

Investors LLC, Heartland Advisors Inc., and The D3 Family Funds LP (collectively

"Major Controlling Stockholders") (hereinafter all the Defendants are collectively

referred to as "Asset") allege violations of the Fair Debt Collection Practices Act, 15

USC 1692 *et seq.* ("FDCPA"); fraud; restitution; unjust enrichment; and violation of

the United States Racketeer Influence and Corrupt Organizations Act ("RICO"), 18

U.S.C. Sections 1961, 1962(b), (c) & (d) and 1964(c) as follows.

## INTRODUCTION

1.      This action arises out of Defendants' actionable conduct in connection

with a collection scheme they created to fraudulently manipulate consumers into

paying money on alleged obligations owed Defendants when the consumers did not

actually owe Defendants the money.  The Defendants all have engaged in a

fraudulent scheme under the guise of "debt buying."  Actually, the Defendants are

solely buying information about a credit card receivable, not legal ownership.

2.      Defendants and their agents have engaged in fraudulent collection

activity by impermissibly pulling credit reports, performing manual and automated

outbound dialer calling activity, sending dunning letters, filing bankruptcy proof of

claims, and filing lawsuits against Indiana residents, while having no legal

ownership of a debt. Plaintiffs maintain that Defendants' actions are quite simply unconscionable.

3.     As such Plaintiffs, on behalf of the putative subclass, seek statutory damages under the FDCPA.

4.     Plaintiffs further seek a judgment ordering Defendants to disgorge their ill-gotten monies under common law theories of fraud, restitution, and unjust enrichment, and ask that the Court enter an award for the total amount of dollars collected from the putative subclass members over the last six years and for treble damages.

5.     Pursuant to RICO, 18 U.S.C. §§ 1961, 1962(b), (c) and (d) and 1964(c), Plaintiffs, on behalf of the putative subclass, seek treble damages sustained as a result of Defendants' schemes and artifices to defraud, acts of mail fraud (pursuant to 18 U.S.C. §§ 1341), and wire fraud (pursuant to 18 U.S.C. § 1343).

6.     Plaintiffs further seek a declaratory judgment that Plaintiffs are under no obligation to render payment to any Defendant arising from alleged money owed by Plaintiffs to Defendants.

7.     While the aforementioned illegal activities are ostensibly performed by Asset with AARS and LRS performing as collection agents of Asset, the strings have been ultimately pulled by AACC and the Majority Controlling Stockholders, which in turn is now controlled by its parent company, Encore. This includes the Individual Defendants as directors/managers/officers/owners of AACC. Under the Third Restatement of

Agency and the doctrine of *respondeat superior*, all the Defendants are liable for the acts of Asset.

## JURISDICTION & VENUE

8.      This Court has jurisdiction for all counts under 15 USC 1692k(d) and 28 USC 1331, 1337, 1367 because Plaintiffs' claims constitute a federal question arising under the FDCPA.

9.      Venue in this District is proper because Plaintiffs reside here and Defendants do business in this District under 28 U.S.C. 1391.

10.      This Court also has jurisdiction under 28 USC 1332(a) because the total amount in controversy for Count 1-10 exceeds $75,000 dollars exclusive of interest and costs.

11.      This Court also has nationwide jurisdiction for all counts under The United States Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(c) & (d) and 1964(c).

12.      Pursuant to *18 U.S.C. §1965(b)*, RICO contains an explicit grant of nationwide service over all the Defendants.

13.      Alternatively, this Court has personal jurisdiction upon "veil piercing" and/or "alter ego" theories.

## PARTIES

### Plaintiffs

14.     Plaintiff Catherine Kuhn is a natural person and citizen of the State of Indiana, residing in Hamilton County.  Defendants used a non-licensed collection agent law firm to file a Complaint in Hamilton County on May 3, 2012.   However, the Complaint was not served until November 18, 2013.  Catherine had no knowledge of the Defendants' claim until receipt of the Complaint, and did not receive mandated disclosure notices.  The Complaint with exhibits and summons, attached as Exhibit 1, allege ownership of a charged-off Fifth Third account.  The only "evidence" is an affidavit signed by an "employee" of Asset which was produced by the law firm retained to file suit.  The alleged ownership is supported by only the fill-in-the-blank, robo-signed affidavit signed by an alleged "authorized representative" of Asset with no knowledge of Fifth Third's business records. Catherine was forced to hire legal counsel to contest the unlawful collection activity.

15.     Plaintiff, Mychelle Casel, is a natural person and citizen of Indiana residing in Hendricks County.  Asset alleges to have purchased a Capital One Bank account pursuant to a Forward Flow Sale Agreement dated March 11, 2009. Despite the claim of purchasing an account in 2009, Plaintiff Casel never received a notice from Asset until a bankruptcy proof of claim was filed in September 2013 for a case, which was subsequently dismissed.  The proof of claim with exhibits is attached as Exhibit 2.   The filing of this proof of claim was fraudulent.  In 2004, Plaintiff Casel paid off this Capital One account in order to purchase a residence.

Plaintiff Casel was forced to hire legal counsel to contest the unlawful collection activity.

16.  Plaintiff, Bryan Strohm, is a natural person and citizen of Indiana, residing in Monroe County. Bryan has two accounts with Asset. With the first account, Defendants used a non-licensed collection agent law firm to file a complaint in Monroe County. In the complaint, attached as Exhibit 3, the plaintiff alleged ownership of a First USA/Chase Bank NA[1] account but this allegation was supported only by an identical fill-in-the-blank, robo-signed affidavit signed by an alleged "authorized representative" of Asset with no knowledge of FirstUSA/Chase's business records or how the account went from First USA to Chase. Plaintiff Strohm was forced to file bankruptcy in part to stop this litigation. Asset filed a fraudulent proof of claim, in which Asset alleges to have purchased the account from a "Credit Card Account Purchase Agreement" dated August 8, 2008. However, there is only appended a single redacted page from the purchase agreement attesting to ownership while omitting the more than 30 additional pages where the Chase disclaims the lack of evidence. The bankruptcy was dismissed and Asset then revived the state court lawsuit by filing for proceedings supplemental, which is attached as Exhibit 4. Plaintiff Strohm then was forced to file another bankruptcy, which is pending and Asset has filed yet another fraudulent proof of claim, which is attached as Exhibit 5. Plaintiff Strohm's second account is a BP/ Chase account. In yet another fraudulent proof of claim, which is attached as Exhibit 6, Asset alleges

---

[1] Chase Bank NA is under a current Consent Order with the US Department of Treasury Comptroller of the Currency (#2013-138). The Consent Order requires Chase to cease sales of debt accounts to entities like Asset.

purchase of an account pursuant to a "Credit Card Account Purchase Agreement" dated June 9, 2008.  Plaintiff Strohm was forced to hire legal counsel to contest the unlawful collection activity.

17.   Plaintiff, Shaun Booker, is a natural person and citizen of the State of Indiana, residing in Marion County.  Defendants used a non-licensed collection agent law firm to file a Complaint in Marion County, which is attached as <u>Exhibit 7</u>. Plaintiff Booker had no knowledge of the Defendants until receipt of the Complaint and did not receive any initial disclosure notice.  In the complaint, Defendants alleged ownership of a Chase Bank/First USA account by only a fill-in-the-blank, robo-signed affidavit signed by an alleged "designated full-time employee" of Asset with no knowledge of Chase Bank/First USA's business records.  There is also a single page Bill of Sale[2] referring to the same "Credit Card Account Purchase Agreement" dated August 8, 2008 as Plaintiff Strohm's.   That portion of the Purchase Agreement alone (usually the contract last for 6 months & Asset has purchased 966 portfolios from January 2006 through December 2012) was for 36,054 accounts with a face value of $146,365,209.45, with a "premium" paid of 4.75% of the face value.  Plaintiff Booker also was forced to hire legal counsel to contest the unlawful collection activity.

18.   Plaintiff, Lester Rogers, is a natural person and citizen of the State of Indiana, residing in Marion County.  Plaintiff Rogers had no knowledge of the

---

[2] The Bill of Sale is signed by "Team Leader." There is no indication that an authorized representative or corporate officer of Chase Bank USA NA signed the document.  At least one Court has held that a "team leader" did not have proper authority to execute the assignment on behalf of Chase. *See Chase Bank USA, N.A. v. Cardello*, 2010 NY Slip Op 20090 (N.Y. City Ct. March 4, 2010).

Defendants until he reviewed his credit report before he filed for bankruptcy. Asset filed a fraudulent proof of claim on April 26.2013, attached as <u>Exhibit 8</u>, based upon alleged ownership of an HH Gregg/GE Money Bank account. The allegation was supported only by a redacted Bill of Sale referring to a Forward Flow Purchase Agreement dated March 25, 2010. After objection and a request for verification of ownership, Asset's legal counsel stated that Asset was not in possession of a signed application, nor had one been located. The response is attached as <u>Exhibit 9</u>. Lester also was forced to hire legal counsel to contest the unlawful collection activity.

## Defendants

19.   At the top of the "Asset structure" is Encore. Encore is a Delaware corporation. Encore is the direct parent of AACC. Encore controls the unlicensed, illegal collection enterprise. Encore has licensed its "debt buyer", Midland Funding LLC. Encore is a publically-traded company that reported approximately $500 million revenues for the year ending December 31, 2012. The business address for Encore is 3111 Camino Del Rio North Suite 1300, San Diego, CA 92108.

20.   Defendant AACC is a Delaware corporation. AACC is a wholly-owned subsidiary of Encore. AACC was a publically-traded corporation until July 2013. AACC wholly-owns the subsidiaries AARS and Asset. AACC's business is purchasing and collection charged-off account portfolios from consumer credit

originators.[3]  From January 1, 2006 through December 31, 2012, AACC invested approximately $1 billion in the acquisition of charged-off accounts, representing over $33.0 billion in face value of accounts and tens of millions of consumer accounts. The business address for AACC is 28405 Van Dyke Avenue, Warren, MI 48093.

21.    The Individual Defendants own, manage, direct, operate, supervise, and oversee the business activities of all the Asset business entities during the majority of the relevant time involved in this Complaint, which are all interrelated in a clandestine and complex business structure.  The Individual Defendants received and reviewed the FTC's Consent Decree within 30 days of January 31, 2012.  Defendants Rion Needs, Reid Simpson, and Deborah Everly are individuals believed to be citizens of the State of Michigan.  The business address for these Individual Defendants is:  28405 Van Dyke Avenue, Warren, MI 48093.

22.    Rion B. Needs is the President and Chief Executive Officer of AACC. Mr. Needs joined AACC in July 2007 as Senior Vice President and Chief Operating Officer. In January 2009, he was promoted to President and Chief Executive Officer and the Board of Directors appointed Mr. Needs to serve as a Director.

23.    Reid E. Simpson is the Senior Vice President—Finance and Chief Financial Officer, Assistant Secretary and Treasurer of AACC.  Mr. Simpson joined AACC in May 2010 as Senior Vice President—Finance, Chief Financial Officer, Assistant Secretary and Treasurer.

---

[3]See 2012 AACC's SEC Form 10-K, ending December 31, 2012, p. 2.  The Purchaser of an account in default is a "debt collector."  *See McKinney v. Cadleway Props. Inc.*, 548 F3d 496, 501 (7th Cir. 2008); *Schlosser v. Fairbanks Capital Corp.*, 323 F3d 534, 536 (7th Cir. 2003).

24.     Deborah L. Everly is the Senior Vice President and Chief Acquisitions Officer of AACC. Ms. Everly joined AACC in May 1995. Ms. Everly was named Director of Marketing and Acquisitions and promoted to Assistant Vice President in 1997. In 1998, she was promoted to Vice President-Marketing and Acquisitions and in 2007, she was promoted to Senior Vice President and Chief Acquisitions Officer. Ms. Everly has been in the accounts receivable management industry since 1991. Her duties include finding portfolios of accounts and selling existing accounts to third parties. Ms. Everly signed the August 8, 2008 Bill of Sale on behalf of Asset.

25.     Defendant, Asset Acceptance LLC ("Asset") is a Delaware limited liability company formed in 2002.    Asset is engaged in the business of purchasing accounts and collection activities.  Asset is the holding company of the consumer accounts.  Asset is a "debt collector" as defined by the FDCPA and the Indiana Code.  Asset has and continues to inexcusably engage in collection activity absent a license in Indiana to operate as a consumer collection agency in violation of Indiana Code 25-11-1-3.  This illegal activity continues in spite of the first risk factor listed on AACC's Form 10-K ending December 31, 2012, that "[m]any states and several cities require that we be licensed as a debt collection company" and failure to comply with this regulation could result in the "imposition of financial penalties." Asset operated in the State of Indiana absent a certificate of authority (I.C. 23-17-26-1 and 23-1-49-1) or certificate of admission (I.C. 28-1-22-28(b) until June 29,

2012.[4]  The business address for Asset is 28405 Van Dyke Avenue, Warren, MI 48093.

26.   Defendant, Asset Acceptance Recovery Services LLC ("AARS") is a Delaware limited liability company formed in December 2010.  AARS's sole purpose is to manage Asset's network of collection law firms.  AARS provides legal collection management services to Asset.  AARS licensed itself as a collection agency in the State of Indiana on July 31, 2013.  The business address for AARS is 28405 Van Dyke Avenue, Warren, MI 48093.

27.   Defendant, Legal Recovery Solutions LLC ("LRS") is a Delaware limited liability company.  LRS is a wholly-owned subsidiary of AACC.  LRS is a software technology company providing products and services to the collection industry including legal collection software, which is used on behalf of Asset.  The business address for LRS is 28405 Van Dyke Avenue, Warren, MI 48093.

28.   Defendants AAC Quad-C Investors LLC and Quad-C Management Inc., are located at 200 Garrett Street Suite M, Charlottesville VA 22902. Defendant Heartland Advisors Inc. is located at 789 N. Water Street Suite 500, Milwaukee WI 53202.  Defendants D3 Family Funds LP  and Nierenberg Investment Management Co. are located at 19605 NE 8th St, Camas WA 98607. These five defendants were controlling stockholders of the Asset enterprise until

---

[4] Asset has been subject to multiple suits regarding non-licensing so its management is aware of the licensing requirement and possibility of lawsuit for failure to comply. *See City of New York Dept. of Consumer Affairs v. Asset Acceptance LLC*, violation PL 104492 (July 24, 2006) *aff'd* February 23, 2007.

11

June 2013 and received financial gain due to Asset's illegal enterprise and sale to Encore as stockholders of AACC.

29.     John Does 1- 50 are the unknown co-conspirator actors, business entities, and agents in Asset's fraudulent scheme at the time of filing.

## FACTUAL ALLEGATIONS

### A.     Securitization- Asset Backed Securities

30.     Consumer awareness and the legal system have not fully comprehended the two game changing evolutions that have greatly altered the world's financial landscape: (1) Securitization and (2) Credit Enhancements.[5]

31.     After the Savings and Loan Crisis of the 1980s, federal regulators and bank shareholders encouraged financial institutions to dispose of liability through securitization rather than to raise new capital to comply with the Basel Accords.

32.     An asset-backed security (ABS) is a manufactured financial instrument whose value and income payments are derived from and backed by a specific pool of credit card receivables by an originating bank.[6] Pooling the originating bank's receivables into financial instruments allows them to be sold to outside investors, a process called "securitization". The originating bank transfers the receivables to a special purpose vehicle (SPV). The SPV bundles the underlying receivables. The SPV creates and sells securities, which represent an ownership,

---

[5] "This stuff is so complicated how is anybody going to know" is a finding of the National Commission on the Causes of the Financial Crisis in the United States as part of the Fraud Enforcement and Recovery Act (Public Law 111-21), *Authorized Edition The Financial Crisis Inquiry Report* pg. 45 and 68 published by Public Affairs January 2011.

[6] All sorts of unsecured loans, including gym memberships, are also securitized.

not in a specific receivable, but instead an undivided interest in the entire pool. The proceeds of the sale are paid to the originating bank with a premium. The receivables are held by a trustee. Upon the sale, the originating bank removes the risky underlying receivables from its balance sheet. The outside ABS investors hire a third party to service the consumer payment of the receivables for a fee.

33.     The ABS and prospectus are registered with the Securities and Exchange Commission ("SEC").  These documents specifically state that the receivables are sold to the trust.[7]

34.     The main results of securitization are: 1) the originating bank is paid in full; 2) the originating bank surrenders all control and ownership including all rights, title, and interest over the receivables; 3) the outside investors own the receivables as result of a true sale; 4) evidence of indebtedness is delivered to the Trustee; 5) the originating bank transforms into the servicer for the ABS; and 6) the originating bank cannot get the receivables back without violating IRS, SEC, and accounting rules.[8]

35.     While FASB 166-167 prohibits the repurchase of defaulted receivables from the Trust, it does not prohibit the sale of information/data about the defaulted receivable.  As servicer, the bank gathers data as an ongoing process of servicing. This data is not evidence of indebtedness.  The Bill of Sale and Purchase Agreements specifically limit the sale to the originating bank's interest in the

---

[7] Plaintiffs Strohm's & Booker's receivables were securitized into the First USA Credit Card Master Note Trust.  Plaintiff Roger's receivables were securitized into the GE Capital Credit Card Master Note Trust.  Plaintiff Kuhn's receivables were placed into the Fifth Third hybrid securitization. Plaintiff Casel's receivables were securitized into the Capital One Credit Card Master Note Trust.
[8] See Financial Accounting Standards Board Statement ("FASB") No. 166-167

receivable, which after securitization is solely the data not ownership of the receivable.[9]

36.     Credit enhancements are a key part of the securitization process since they are guarantees that the risk-averse investors will get paid in full if there is a default of the receivables. The most common type of credit enhancement is the credit default swap (CDS). A CDS is a written gambler's contract, where a protection seller agrees to compensate the protection buyer for face value of the underlying referenced receivable should a "credit event" such as a consumer bankruptcy or payment default take place. In exchange for the promise, the protection buyer pays a periodic premium payment to the protection seller.

37.     Upon a credit event, the ABS servicer has 180 days to collect upon the receivable. If the ABS servicer is unsuccessful, the debt is considered "charged-off". That means that the ABS servicer informs the ABS investor of the credit event; the credit enhancements are "tapped"; and, the ABS investor is paid in full. Since the ABS investor is paid in full, there is no longer a debt obligation.

**B.     Finally an answer to what has baffled the consumer and the legal system**

38.     The baffling question is why the Defendants have no evidence of the alleged debt? The answer is: the Defendants are not buying the debt. The originating bank, now servicer, only retains the data necessary to service the receivables. The servicer no longer owns the receivables and therefore cannot sell

---

[9] However, the Graham-Leach-Bliley Act ("GLBA") still requires an initial privacy notice, opt-out notice, and annual notice regarding nonpublic personal information. (Defendants sometimes provide the initial privacy notice but do not comply with the other requirements). GLBA includes "debt buyers" and has civil and criminal penalties for noncompliance.

the receivables.  Instead, the servicer sells limited account data to AACC and its subsidiaries including Asset.

39.   The U.S. Government has come to the conclusion that the electronic database that the Defendants purchase "does not include account documents such as contracts signed by the consumer" and a document "that may substantiate the portfolio's data does not exist."[10]   The Federal Trade Commission ("FTC")'s complaint charged, amongst other things, misrepresenting that consumers owed a debt when Asset could not substantiate its representations.

40.   On December 12, 2009, the FTC sent an "Order to File a Special Report" titled "Resolution Directing the Use of Compulsory Process to Study the Practice of Debt Buying" to nine (9) alleged debt buyers including Encore.  The FTC concluded that "[t]he system for resolving disputes about consumer debts is broken" and debt buyers are "filing suits based on insufficient evidence."[11]

41.   The FTC also reported systematic problems with evidence of indebtedness in the litigation process.  Included were evidentiary problems existing with affidavits where the affiant had no personal knowledge of any debt.  The FTC found that debt buyers would not carry their burden of proof in collection lawsuits, if the affidavits were challenged as not falling within the business records exception

---

[10] *United States v. Asset Acceptance*, 8:12-cv-182-T-27Eat(US District Court Middle District Florida January 30, 2012) complaint #11, #13.
[11] Findings published in July 2010 FTC Report Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration, Pg. I and II.

to the hearsay rule.  "Inaccurate affidavits in debt collection lawsuits cause real harm to consumers ..."[12]

42.    The FTC January 2013 report entitled "The Structure and Practices of the Debt Buying Industry" states in part:

1. INFORMATION OBTAINED FROM SELLERS AT TIME OF PURCHASE

In its study, the Commission obtained information from debt buyers concerning the data files and media they received from debt sellers at the time of sale. The FTC was able to analyze the data files for over 5 million accounts that debt sellers transmitted to debt buyers at the time of purchase

The key findings of the study are as follows:

PRICES BUYERS PAID FOR PURCHASED DEBT

**Buyers paid an average of 4.0 cents per dollar of debt face value.** Analysis of the prices debt buyers paid for debt purchased in more than 3,400 portfolios showed that the average price was 4.0 cents per dollar of debt face value.

ACCOUNT DOCUMENTATION THAT DEBT BUYERS RECEIVED

**Buyers received few underlying documents about debts.** Although buyers received the data file and some other information about the debts, as discussed above, they obtained very few documents related to the purchased debts at the time of sale or after purchase. For most portfolios, buyers did not receive any documents at the time of purchase. Only a small percentage of portfolios included documents, such as account statements or the terms and conditions of credit.

WARRANTIES AS TO INFORMATION AND DOCUMENTATION THAT DEBT BUYERS RECEIVED

**Accuracy of information provided about debts at time of sale not guaranteed.** In purchase and sale agreements obtained in the study, sellers generally disclaimed all representations and warranties with regard to the accuracy of the information they provided at the time of sale about individual debts – essentially selling debts, with some limited exceptions, "as is." The fact that portfolios were generally sold "as is" does not necessarily mean that

---

[12] *Vasalle v. Midland Funding LLC,* 3:11-cv-0096 Brief *Amicus Curiae* of state Attorney Generals (N.D. Ohio June 1, 2011).

information inaccuracies were prevalent, but it does raise concerns about how debt buyers handled purchased debts when such inaccuracies became apparent, and for which they had no recourse available from the seller.

***Accuracy of information in sellers' documents not guaranteed.*** Some contracts stated that when account documents were available from the seller, the accuracy of the information in the documents was not warranted.

DEBT BUYERS' ABILITY TO OBTAIN ACCOUNT DOCUMENTATION

***Limitations were placed on debt buyer access to account documents.*** Buyers were given a defined amount of time (*e.g.*, typically between six months and three years) to request up to a specified maximum number of documents (*e.g.*, equal to 10% to 25% of the number of debts in the portfolio) at no charge.

After that, buyers were given an additional, defined amount of time to request documents for a fee, usually between $5 and $10 per document, with a maximum number of documents again specified. Debt sellers usually had substantial time, typically between 30 and 60 days, to respond to requests for documents.

***Availability of documents not guaranteed.*** Most purchase and sale agreements stated that documents may not be available for all accounts.

***Additional limitations applied to the resale of purchased debt.*** If debt buyers resold debt to secondary buyers, the original creditors typically had no obligation to provide documents directly to the secondary buyers; instead the secondary buyers were required to forward document requests through the original buyers, which sometimes added additional fees and delays.

DOCUMENTS DEBT BUYERS OBTAINED FROM SELLERS AFTER PURCHASE

As discussed above, the debt buyers in the FTC study typically received some information about the debts at the time of sale, including the account number, outstanding balance, and basic information about the debtor.

43.     "A cursory review of the literature demonstrates that the possibility of an alleged debt buyer attempting to collect a debt that it does not actually own, either through assignment or otherwise, is very real."[13]

44.     On October 25, 2011, the Maryland State Collection Agency Licensing Board issued a Summary Order to Cease & Desist and Summary Suspension of Collection Agency Licenses against the largest "debt buyer" in the United States, which operates in a similar manner to the defendants in this case.  The conduct at issue other than failing to be licensed in the state as a collection agency included: (1) "knowingly filing false, deceptive, or deficient affidavits without personal knowledge"; (2) only having a computer database; and (3) not having an actual signed consumer contract.

45.     In addition to the debt buyer using false affidavits, there is now evidence that originating banks are falsifying affidavits on the sale to the debt buyer.[14]

46.     Asset has a history of possessing no proof of alleged debt ownership.[15]

---

[13] *Webb v. Midland Credit Management Inc.* (ND Ill ED, 11-cv-5111 May 31, 2012) Fn. 8,  further citing Peter A. Holland, The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases, 6 J. Bus. & Tech. L. 259 (2011); Rick Jurgens & Robert J. Hobbes, The Debt Machine: How the Collection Industry Hounds Consumers and Overwhelm Courts, The Nat'l Consumer Law Ctr. (July 2010), http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf; FED. TRADE COMM'N, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION AND ARBITRATION (2010), http://www.ftc.gov/ox/2010/07/debtcollectionreport.pdf.
[14] *See* JP Morgan Chase Bank's Consent Order with the US Department of the Treasury Comptroller of the Currency #2013-138, Article I (2) (October 2013) (affidavits made without personal knowledge and inaccurate amounts); American Banker Article (March 29, 2012) titled "Bank of America Sold Card Debts to Collectors Despite Faulty Records."
[15] See Roger's response to objection proof of claim in *Smithner v. Asset Acceptance LLC*, 919 NE2d 1153 (Ind. Ct. App. 2010).

47.     As part of the Defendants' collection activities, Defendants furnish information to consumer reporting agencies. Asset was even sued for 5.7 million consumer records that contained "information that was neither accurate nor complete."[16]

48.     The Minnesota Attorney General has stated that the alleged debt buyers "only acquire an electronic file *about* the debt and not actual copies of underlying charge slips, account statements, signed contracts, etc."[17]

49.     Asset's business is the purchasing and servicing of data. Despite the lack of actual debt ownership, the data has enough information about the consumer to attempt to collect or file a lawsuit. The cheap purchase price reflects the fact that there is no ownership of the debt; that the information is outdated; and there is no indication as to a consumer's willingness and ability to pay.

## C. Asset's Collection Methods

50.     Asset is only buying an electronic portfolio in the form of a spreadsheet of outdated information with no documentation of ownership and no right to commence litigation nor right to pre-judgment interest.

51.     Asset's business is to: 1) underwrite and purchase portfolios of defaulted consumer accounts via wire transfers; and 2) manage collections by two primary channels:  call center collections and legal collections. Defendants' call center collections include in-house call centers and third party collection agencies

---

[16] *Trans Union LLC v. Asset Acceptance LLC*, Complaint paragraph 11 (Cook Cir. Ct. Ill., July 12, 2011). *See Wang v. Asset Acceptance LLC et. al.*, 09-4797 (N.D. Cal. 2009).
[17] Minnesota Attorney General's March 28, 2011 press release.

19

including an agency based in Indiana. Defendants' legal collections involve electronically outsourcing to their network of third party law firms.

52.     The underwriting and purchasing starts with the Defendants finding portfolios and deciding the prices to pay for the accounts. Portfolios are mostly purchased on short-term forward flow agreements and at spot auctions.

53.     Defendants specialize in purchasing and collecting on portfolios of older accounts that have previously been placed with one or more third party collectors and are more than one year old. Defendants' strategy includes pursuing consumers for ten years or longer.[18]

54.     The second segment of Asset's business is to make a profit. This begins with the decision of which accounts are placed into the call center and/or legal collections channel. The legal collection strategy is managed by AARS. AARS provides legal collection management services to Asset. The Compliance Department guides the collection channels. The only evidence of indebtedness is supplied by access to LRS's internet software.

55.     The AACC's SEC Form 10-K for year ending December 31, 2012, recognizes that AACC and its subsidiaries typically do not have sufficient evidence on accounts that are subject to legal collection and that the lack of such evidence could negatively impact the collection rate for their accounts.

56.     The Asset enterprise's primary sources of revenue are revenues by cash proceeds from voluntary, non-legal collections, legal collections, and sales of the accounts to other third party debt buyers.

---

[18] FTC Complaint ¶ 10.

57.    The Asset enterprise is merely buying a "grab bag" of outdated information.  Defendants have to make a profit by collecting on the information especially in light of the debt notes that AACC issued.  After purchasing a portfolio, Defendants load the data into its collection system, update consumers' address information by cross-referencing account data with a national change-of-address database and reports to the national consumer reporting agencies. This sorting process involves the use of the mail, wire, and electronic devices.

58.    Before Asset can coerce payments, it has to locate the consumer ("skip tracing").[19]  Through commercial databases, including impermissibly pulling credit report databases, Asset routinely obtains new address and contact information about consumers it cannot locate. Electronically reporting to the credit bureaus is also a powerful, but low-cost option, as a consumer who is trying to improve a credit score is willing to pay on a reported item whether or not a debt is actually owed.

59.    The Asset enterprise engages in "active" (direct attempt to collect) and "passive" (outsource the collection activities to a separate agency or law firm) collection activities using the mail, telephone, wires, faxes, and internet.  Asset operates like a restaurant franchisor.  First, it acquires the data.  Then it works with law firms around the country providing them with the data files, court witnesses, and affidavits.  In hundreds of Indiana cases, Asset has appended a single page from its purchase agreements attesting to ownership while omitting the more than 30 additional pages where the Originator disclaims the lack of evidence.

---

[19] *See* US v. Asset Acceptance Complaint #15 and Collections 101: A Training Manual for Entry Level Debt Collectors, by RTMC Organization LLC.

Asset electronically transmits information about an account to its call centers and legal collections network.

60.     Based solely on this information and with no evidence of indebtedness, the in-house and outside third parties, at the direction of the Defendants, proceeds with non-legal and legal collections.  For legal collections, Defendants produce a hearsay affidavit to replace the lack of evidence.

61.     To maximize profit, Asset's business model is to: (1) settle with a cooperative consumer, (2) sue the recalcitrant consumer, and (3) sell to another third party "debt buyer" if uncollectable using the mail, wireless, telephone, faxes, and internet.  If a consumer is willing, Asset attempts a payment-in-full (PIF) or settlement-in-full (SIF) or payment plan agreement (PPA).  If consumer is unwilling but able to pay, Asset uses one of its legal network attorneys to file a suit even though Asset lacks proof of debt, which eventually leads to garnishment, freeze of bank accounts, and placing of liens on real estate.  If the account is uncollectable, because the consumer filed bankruptcy, died, or is imprisoned,[20] or if the collection is too costly to pursue because the consumer disputes validity, cannot be found, lives in a State with unfavorable collection laws, Defendants will sell the information to a third party "debt buyer."

---

[20] There are even markets for information that are not legally collectable, such as those discharged in chapter 7 bankruptcy.

## CLASS ACTION ALLEGATIONS

62.    This action is brought on behalf of the following three classes:

a.    The FDCPA Subclass consists of: (i) all Indiana citizens; (ii) who were the subject of collection activity by the Defendants; (iii) in an attempt to collect a debt incurred for personal, family, or household purposes; (iv) which were served with process or contacted in any manner by Defendants; (v) during the one year period prior to the filing of this original complaint in this action through trial of this cause which are in violation of the FDCPA.

b.    The Restitution Subclass consists of: (i) all Indiana citizens; (ii) who paid money to Defendants; (iii) in regard to an alleged debt owed to Defendants; (iv) during the six year period prior to the filing of the original complaint in this action through the trial of this cause.

c.    The Rico Subclass consists of: (i) all Indiana citizens; (ii) who paid money to Defendants; (iii) under Defendants' scheme to defraud; (iv) using the mail or wires; (v) during the four year period prior to the filing of the original complaint in this action through the trial of this cause.

63.    Plaintiffs allege that based upon Defendants and their agents' thousands of phone calls and dunning letters, thousands of bankruptcy proof of claims, and thousands of filings of virtually identical lawsuits that the class is so numerous that joinder of all members of the class is impractical.

64.    There are questions of law or fact common to the classes, which common issues predominate over any issues involving only individual class members.

65.    The common factual issue common to the FDCPA Subclass is whether members were subject to collection activity by or on behalf of Defendants.  The principal legal issue for the FDCPA Subclass is whether Defendants engaged in

debt collection with no legal standing and without requisite license in violation of the FDCPA.

66.     The common factual issue common to the Restitution Subclass is whether Defendants received a monetary benefit from members.  The principal legal issue for the Restitution Class is whether Defendants engaged in collection without legal standing and whether it would be inequitable for Defendants to retain the benefit without paying fair value for it, in violation of common law.

67.     The common factual issue to the Rico Subclass is whether Defendants committed a scheme of fraud using the mail, wireless, telephone, faxes, and internet.

68.     Plaintiffs' claims are typical of those of the class members.  All are based on the same facts and legal theories.

69.     Plaintiffs will fairly and adequately protect the interests of the classes. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices under the FDCPA and class actions.  Neither Plaintiffs nor Counsel have any interest, which might cause them not to vigorously pursue this action.

70.     Certification of the classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

    a.     The questions of law or fact common to the members of the class predominate over any questions affecting an individual member.

    b.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

### COUNT I
### FAILURE TO OBTAIN A DEBT COLLECTION LICENSE AS MANDATED BY I.C. 25-11-1 -7 IN VIOLATION OF THE FDCPA

71.     On behalf of FDCPA class members, Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

72.     The FDCPA has been construed by Federal Courts as a strict liability statute that is to be construed liberally as to effectuate its remedial purpose.[21]

73.     Any potential *bona fide* error defense which relies upon Defendants' mistaken interpretation of the legal duties imposed upon them by the FDCPA would fail as a matter of law.[22]

74.     Asset signed a Consent Decree with the United States of America in which Asset agreed to be "permanently restrained and enjoined" from violating the FDCPA specifically using any false, deceptive, or misleading representation.[23]

75.     Asset's failure to obtain a collection agency license as mandated by Indiana Statutes 25-11-1 et seq., while actively engaging in debt collection in the

---

[21] *Russell v. Equifax A.R.S.,* 74 F 3d 30, 33 (2nd Cir. 1996); 15 U.S.C. 1692k(a).
[22] *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA,* 130 S. Ct. 1605 (US Sup. Ct. April 21, 2010).
[23] Consent Decree pages 16-17.

State of Indiana, violates various provisions of the FDCPA including the following: 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).[24]

76.     Asset is required to be licensed under the Indiana Code and does not have such a license.

77.     IC 25-11-1-7 makes it an unlawful act to conduct business in Indiana as a collection agency without first having obtained a license.

78.     IC 25-11-1-1(a) defines "person" as "any individual, firm, partnership, limited liability company, or corporation."

79.     IC 25-11-1-1 defines "collection agency" as "all persons" "engaging directly or indirectly and as a primary or secondary object, business, or pursuit, in soliciting claims for collections, or in the collection of claims owed or due or asserted to be owed or due to another."

80.     AACC's SEC Form10-K for year ending December 31, 2012 lists the first risk factor as:  There are "*state-and-local specific licensing requirements that affect our operations . . .* "

81.     Asset is a collection agency in the state of Indiana.

82.     The Corporate Defendants and the Individual Defendants have intentionally and knowingly made a decision not to license Asset as a collection agency despite licensing another subsidiary collection agency.[25]

---

[24] In *LeBlanc v. Unifund CCR Partners*, 601 F3d 1185 (11th Cir. 2010) and *Bradshaw v. Hilco Receivables, LLC*, 2011 U.S. Dist. Lexis 17954 (D. Md. February 23, 2011) held that not registering as a collection agency constitutes a valid, if not *per se*, violation of the FDCPA.
[25] Only one AACC subsidiary "debt collector" is licensed as a collection agency which is AARS despite its Parent, Encore, having registered its debt buyer (Midland Funding LLC) which is involved in the exact same business as Defendants.

83.     Asset's unlicensed collection activity constitutes false, deceptive or misleading representation or means in connection with the collection of the debt under 15 U.S.C. 1692e.[26]

84.     Each Defendant is a "debt collector" under 1692(a) (6).[27]  The FDCPA's plain language includes any person who "directly or indirectly" attempts to collect on a regular basis and is only purchasing after a default.

85.     AARS is a "debt collector" by virtue of licensing as a "debt collector." Despite doing business in Indiana, AARS did not license as a collection agency until July 31, 2013 and that expired December 31, 2013.  *See McKinney v. Cadleway Props. Inc.*, 548 F3d 496, 501 (7th Cir. 2008); *Schlosser v. Fairbanks Capital Corp.*, 323 F3d 534, 536 (7th Cir. 2003).

86.     Each Corporate Defendants is a "debt collector" since the Asset enterprise is acting fraudulently by collecting with no legal ownership of a debt and the business is in the business of collecting debt.

87.     Each Individual Defendants is a "debt collector" since the Asset corporate veil can be pierced.

88.     "Debt" includes an "alleged obligation." 15 USC 1692a (5).

89.     Further, 15 U.S.C. 1692e provides a non-exhaustive list of conduct that violates the FDCPA, including 15 U.S.C. 1692e (5) "threat" to take an action that cannot legally be taken.

---

[26] This also violates Asset's Consent Decree's "injunction against FDCPA violations" with the United States of America.  *USA v. Asset Acceptance LLC*, 8:12-cv-182-T-27Eat (US D. Ct. M.D. Fla.  Jan. 31, 2012)
[27] Page 11 of AACC's Form-10-K states that the FDCPA is applicable to AACC and its subsidiaries.

90.     Asset's unlicensed activity constitutes a threat to take action that cannot legally be taken in violation of 15 U.S.C. 1692e (5).

91.     Asset's unlicensed activity constitutes a false and deceptive means of collecting or attempting to collect a debt in violation of 15 U.S.C. 1692e (10).

92.     Asset's unlicensed activity constitutes an unfair means of collecting or attempting to collect a debt in violation of 15 U.S.C. 1692f and 1692f (1).

93.     Plaintiffs must only prove one violation of the FDCPA to trigger liability.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1.  Actual Damages;

2.  Statutory damages;

3.  Attorney's fees, litigation expenses and costs of the instant suit; and

4.  Such other relief as the Court deems proper.

## COUNT II
## FAILURE TO OBTAIN A COLLECTION LICENSE
## MANDATED BY INDIANA AND JUDGMENT VOID AB INITIO VIOLATION
## OF THE FDCPA

94.     On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

28

95. The unlicensed collection activity of Asset is without standing and illegal due to lack of collection license.

96. Any judgment acquired by Asset against the Plaintiffs is void ab initio.[28]

97. Defendants made threats or actually filed legal action against Indiana residents when they had no right to.[29]

98. Defendants' actions violate 15 U.S.C. 1692e of the FDCPA.

99. Defendants' actions violate 15 U.S.C. 1692e (5) of the FDCPA.

100. Defendants' actions violate 15 U.S.C. 1692e (10) of the FDCPA.

101. Defendants' actions violate 15 U.S.C.1692f of the FDCPA.

102. Defendants' actions violate 15 U.S.C. 1692f (1) of the FDCPA.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1. Actual Damages;

2. Statutory damages;

3. Attorney's fees, litigation expenses and costs of the instant suit; and

4. Such other relief as the Court deems proper.

---

[28] *See LVNV Funding LLC v. Trice*, 952 NE2d 1232 (Ill. App. 2011)(holding that legislature's criminalization of an unregistered collection agency's collection activity establishes an intent to void any judgment entered in favor of an unlicensed collection agency.) and *Finch v. LVNV Funding LLC*, 212 Md. App. 748 (Md. App. 2013) (holding that when an unregistered collection agency obtains a judgment against a consumer, the lack of a license makes the judgment void).

[29] *Berg v. Blatt, Hasenmiller, Leibsker and Moore LLC*, 07c4887 (N.D. Ill. August 29, 2007) and *Guevara v. Midland Funding NCC-2 Corp.*, 07c5858 (N.D. Ill. June 20, 2008) held that misrepresentation of an entity "authorized to do business" is sufficient to state a FDCPA claim.

## COUNT III
## CHARGING PRE-JUDGMENT CONTRACT INTEREST WITHOUT A
## CONTRACT VIOLATION OF THE FDCPA

103.   On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

104.   Asset illegally charges excessive prejudgment interest to consumers without contractual right.

105.   The FTC Complaint against Asset, the January 2013 FTC report, the purchase agreements which expressly state that there is no contract included, AACC's 2012 Form 10-K ending December 31, 2012, stating that documentation is available but not stating that contracts have been purchased, and the admission in *Rogers* all are evidence that Defendants do not have the contractual rights set forth in the original application/contracts.

106.   Defendants' actions violate 15 U.S.C. 1692e of the FDCPA.

107.   Defendants' actions violate 15 U.S.C. 1692e (5) of the FDCPA.

108.   Defendants' actions violate 15 U.S.C. 1692e (10) of the FDCPA.

109.   Defendants' actions violate 15 U.S.C.1692f of the FDCPA.

110.   Defendants' actions violate 15 U.S.C. 1692f (1) of the FDCPA.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1.  Actual Damages;

2. Statutory damages;

3. Attorney's fees, litigation expenses and costs of the instant suit; and

4. Such other relief as the Court deems proper.


**COUNT IV**
**FAILURE TO ACTUALLY OWN THE**
**DEBT IN VIOLATION OF THE FDCPA**

111.    On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

112.    Asset does not legally own a debt but solely possesses data.[30]

113.    Defendants' actions violate 15 U.S.C. 1692e of the FDCPA.

114.    Defendants' actions violate 15 U.S.C. 1692e (2)(A) of the FDCPA by falsely representing the "character, amount, or legal status" of a non-existent debt.

115.    Defendants' actions violate 15 U.S.C. 1692e (5) of the FDCPA.

116.    Defendants' actions violate 15 U.S.C. 1692e (8) of the FDCPA prohibiting the reporting of credit information which is known or should be known to be false.

117.    Defendants' actions violate 15 U.S.C. 1692e (10) of the FDCPA.

118.    Defendants' actions violate 15 U.S.C.1692f of the FDCPA.

---

[30] *Matmanivong v. Unifund CCR Partners*, 08 CV 6415 (N.D. Ill. Apr. 28, 2009) finding that a "defendant's lack of ownership of the debt could support a cause of action under the FDCPA.

119.    Defendants' actions violate 15 U.S.C. 1692f (1) of the FDCPA since there is no legal ownership of a debt and no agreement expressly authorizing collection amounts.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1.  Actual Damages;

2.  Statutory damages;

3.  Attorney's fees, litigation expenses and costs of the instant suit; and

4.  Such other relief as the Court deems proper.

## COUNT V
## INDIANA COMMON LAW FRAUD

120.    On behalf of Restitution Subclass members, Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.

121.    The elements of actual fraud are: (1) a material representation of past or existing facts which; (2) was false; (3) was made with knowledge or reckless ignorance of falsity; (4) was made with intent to deceive; (5) was rightfully relied upon by the complaining party and; (6) proximately caused injury to the complaining party.

122.   Defendants made a material representation that Asset legally owned an alleged debt by Plaintiffs (when Asset did not and could not) and was entitled to monies when they were not.

123.   Defendants had knowledge, or acted in reckless ignorance, that Asset did not and does not legally own an alleged debt and that Defendants purchased nothing more than information about the alleged debt.

124.   Defendants had knowledge or reckless ignorance that Asset is not licensed in the State of Indiana to perform collections against Indiana residents and avail itself of Indiana's courts to collect against Plaintiffs.

125.   Based on Asset's and Asset's agents telephone calls, dunning letters, credit bureau reportings, bankruptcy proof of claims, robo-signed affidavits, as well as other inducing evidence such as Asset computer printouts and redacted bill of sales, the Plaintiffs legitimately relied upon the misrepresentation herein made by Defendants to Plaintiffs' detriment by paying monies to Asset.

126.   Defendants intended to deceive each Plaintiff into believing that Defendants were collecting on legitimate debts by designing and implementing a collection *enterprise* that gave Defendants the appearance of their ownership of the debt.

127.   Defendants intended to deceive Plaintiffs, their counsel, and the legal system that Asset had standing to bring legal process to collect money from Plaintiffs using solely the information it purchased with no legal debt ownership.

33

128.   Defendants' scheme, deceitful threats, legal process, and collection of money from Plaintiffs proximately caused damage to Plaintiffs' privacy, credit ratings, employment, loss of money, and consequential harm.

***Wherefore***, Plaintiffs, on behalf of the Restitution Subclass, request that the Court enters judgment in favor of Plaintiffs and the Restitution Subclass and against Defendants for:

1. Treble damages;

2. Consequential damages;

3. Punitive damages;

4. Attorney's fees, litigation expenses, and costs of instant suit; and

5. All other relief as necessary in the premises.

## COUNT VI
## RESTITUTION

129.   On behalf of Restitution Subclass members, Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.

130.   A member of the Restitution class conferred a benefit on the Defendants; more specifically a payment towards an alleged debt owned by Asset.

131.   Defendants have knowledge of the benefit (i.e. the money paid by each respective consumer towards the alleged Asset debt).

132.   Defendants have accepted or retained the benefits conferred (i.e. the above-referenced payment).

133.   The circumstances are such that it would be inequitable for Defendants to retain the benefit without paying fair value for it.

*Wherefore*, Plaintiffs, on behalf of the Restitution Subclass, request that the Court enter judgment in favor of Plaintiffs and the Restitution Subclass and against Defendants for:

1.     Actual damages, for the total dollars unlawfully collected by Defendants from the members of the Restitution Subclass over the last six years (plus interest);

2.     An order instructing Defendants to disgorge their ill-gotten monies from the Restitution Subclass;

3.     Litigation expenses and costs of this instant suit; and

4.     Such other and further relief as the Court deems proper.

## COUNT VII
## UNJUST ENRICHMENT

134.   On behalf of Restitution Subclass members Plaintiffs now re-alleges each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.

135.   Plaintiff alleges that the Defendants have unjustly retained a benefit to the Plaintiffs' detriment, and that Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

136.   Plaintiffs have suffered a detriment - monies paid & damage to their credit report.

137. Plaintiffs' detriment has a connection between the detriment and the Defendants' retention of the benefit.

138. The Defendants' retention of Plaintiffs' monies is a detriment to Plaintiffs.

139. Plaintiffs would have acted differently, had they known Defendants had no standing to file a lawsuit or engage in any other collection as a result of Defendants' failure to be licensed, lack of a debt, and lack of legal ownership of the alleged debt.

140. The transfer of money from Plaintiff to Defendant in exchange for paying off alleged debt violated the fundamental principles of justice, equity and good conscience so the Defendants' continued retention of money is a detriment.

141. The acts of Defendants complained of herein constitute unjust enrichment of Defendants at Plaintiffs' expense in violation of the common law of Indiana.

142. Plaintiffs are entitled to disgorgement of ill-gotten gains in an amount to be proved at trial.

**Wherefore,** Plaintiffs, on behalf of the Restitution Subclass, request an Order from the Court requiring Defendants to disgorge all ill-gotten gains acquired from their deceptive illegal conduct and all other recovery necessary in the premises.

## COUNT VIII
### (Civil RICO as to all Defendants)
### Acquisition and Maintenance of an Interest in and Control of
### An Enterprise Engaged in a Pattern of Racketeering Activity:
### 18 U.S.C. 1961 (5), 1962 (b)

143.   On behalf of the Rico Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by reference as if all were set forth fully herein.  Substance prevails over form.

144.   At various times and places partially enumerated in Plaintiffs' documentary material, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

145.   The Individual defendants and the Majority Controlling Stockholders, AACC, Asset, AARS, LRS, and Encore, together have created an illegal consumer account enterprise.  Each Corporate and Individual Defendant has a role as a member of the illegal enterprise as set forth above.

146.   During the ten (10) calendar years preceding January 15, 2014, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

147.   Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated

intentionally to threaten continuity, *i.e.* a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra.*

**Wherefore,** pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiffs request judgment against all named Defendants as follows:

1.  That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

3.  That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

4.  That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

5.   That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

6.   That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked.

7.   That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiffs, their heirs, and assigns.

8.   That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

## COUNT IX
### (Civil RICO as to all Defendants)
### Conduct and Participation in a RICO Enterprise
### Through a Pattern of Racketeering Activity:
### 18 U.S.C. 1961 (5), 1962 (c)

148.   On behalf of the Rico Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by references as if all were set forth fully herein.

### i) ALLEGATIONS IN SUPPORT OF CONDUCT AND PARTICIPATION

149.   At various times and places partially enumerated in Plaintiffs' *documentary material,* all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

150.   Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity,* all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

151.   As a result of Defendants' actions alleged Indiana Plaintiffs were defrauded in an amount estimated to exceed $ 25,000,000, the exact amount to be determined at trial, in payments which Defendants received for fraudulently collecting against Plaintiffs.

152.   Defendants were not registered in Indiana and were not licensed to practice any collection activity in Indiana and have fraudulently committed collection demands upon Indiana consumers and illegally and systematically threatened collection through legal process on debts Defendants did not own and Plaintiffs were not obligated to pay.

153.   Effectively, Defendants have engaged in multiple episodes of fraudulent activity ranging from schemes defrauding Indiana consumers in collection practices alleged herein. That their ongoing pattern of racketeering has continued despite repeated legal actions initiated in several states and their predicate offenses mail fraud and wire fraud.

154.   The Defendants and their agents were able to collect millions of dollars on alleged consumer debts they did not own and Plaintiffs did not owe through their unlicensed collection schemes.

155.   Defendants and their agents swept money out of frozen checking and savings accounts of Plaintiffs, and made ACH wire transfers and check payments to Asset and ultimately to all Defendants.

156.   Defendants swept money out of Plaintiffs' payroll accounts pursuant to garnishment orders by wire transfers from Plaintiffs' employers to Asset electronically by ACH transfers on behalf of Defendants.

157.   The pattern of racketeering acts set forth herein were carried out over nearly a seven-year period, were related and similar, were committed as part of Defendants' ongoing scheme to defraud Plaintiffs, the courts and in furtherance of Defendants' RICO enterprise and if not stopped will continue in the future.

158.   During the period in which the individual Defendants operated the enterprise, they submitted multiple collection documents demanding payment of money and threatening legal action against Plaintiffs under the fraudulent pretense that the recipient of the letter was legally required to make the payment when it knew or should have known that the Plaintiff was not obligated to make payment.

159.   The collection letters and supporting documents mailed by the Defendants, as well as the payments that plaintiffs made in response to those collections, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud,

extending from the formation of the enterprise through the date of the filing of this Complaint.

160.   In addition to the specific misrepresentations identified for each of the mailings on that list, each and every document identified on the list contains the implicit material misrepresentation that the bill was generated by a legitimate professional corporation that was registered and licensed to operate under the mandates of the laws of the State of Indiana.

### ii) PREDICATE ACTS: MAIL AND WIRE FRAUD: 18 U.S.C. §§ 1341, 1343

161.   Each of the thousands of submissions constitutes mail fraud pursuant to 18 U.S.C. § 1341.

162.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b). By causing the mailing of thousands of false reports, the Defendants have conducted the affairs of their fraudulent collection enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

163.   Each of the thousands of wire and electronic transmissions constitutes wire fraud pursuant to 18 U.S.C. § 1343.

164.   Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §1961(1)(b).

### iii) PATTERN OF RACKETEERING ACTIVITY

165.   At various times and places partially enumerated in Plaintiffs' documentary material, all Defendants did associate with a RICO enterprise of

individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

166. During the ten (10) calendar years preceding January 15, 2014, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

167. By causing thousands of wire transactions consisting of calls to Plaintiffs, electronic transfers of Plaintiffs' personal information, and electronic banking transactions with Plaintiffs' money, the Defendants have conducted the affairs of their fraudulent collection enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

168. Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective collection *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

### iv) DAMAGES SUSTAINED BY THE PLAINTIFFS

169. Each of the Plaintiffs was injured in its business or property, by reason of Defendants' violation of 18 U.S.C. § 1962(c). Plaintiffs suffered troublesome collection, unwanted phone calls, were threatened with legal action, sued, and defrauded into making payments to Defendants and paying for legal representation.

170.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**Wherefore,** pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiffs on behalf of the Rico Subclass, request judgment against all named Defendants as follows:

1.    That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

2.    That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) *supra*.

3.    That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s).

4.    That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or

advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

5.     That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

6.     That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

7.     That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked.

8.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiffs, their heirs and assigns.

9.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT X**
**(CIVIL RICO as to all Defendants)**
Conspiracy to Engage in a
Pattern of Racketeering Activity
18 U.S.C. §§ 1961(5) and 1962(d)

171.    On behalf of the RICO Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.

### i) ALLEGATIONS IN SUPPORT OF CIVIL CONSPIRACY CLAIMS

172.    The elements for a civil conspiracy claim are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) which agreement results in injury to the plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.

173.    At various times and places alleged herein by Plaintiffs all Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

174.    As more fully described above, Defendants separately and in conjunction with each other conspired to defraud Plaintiffs into paying money to Defendants' enterprise.

175.    A RICO enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).

176. The Plaintiffs allege that Defendants formed an enterprise that operated in furtherance of a common purpose beginning in or around September 2002 and still active.

177. While each Defendant participated in and are members and part of this enterprise, they also have an existence separate and apart from the enterprise.

178. In order to intentionally, successfully and convincingly bluff Plaintiffs and the Courts into believing that Defendants had authority to collect, Defendants establish an aura of bona fide authority to perfect their collection scheme.

179. Defendants controlled and operated this enterprise through a variety of means, including, but not limited to, the following: (a) developing and utilizing a common scheme designed to mislead Plaintiffs and the Court into believing that Defendants held legal ownership of an alleged debt by manufacturing false affidavits; (b) falsely representing that Plaintiff's owed money to Defendants when Plaintiffs did not; (c) mailing dunning letters to Plaintiffs demanding money Plaintiffs did not owe; (d) making phone calls to demand payments which Plaintiffs did not owe (c) filing lawsuits against Plaintiffs who did not owe Defendants (d) and garnishing wages.

**ii) PREDICATE ACTS: MAIL AND WIRE FRAUD: 18 U.S.C. §§ 1341, 1343**

180. During the ten (10) calendar years preceding January 15, 2014, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§

1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. 1962(d) (Prohibited activities).

181. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud), and 18 U.S.C. § 1343 (relating to wire fraud).

182. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Defendants in violation of 18 U.S.C. § 1341, caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

183. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, misrepresentations or promises, Defendants, in violation of 18 U.S.C. 1343, transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

184. Upon good information and belief, Defendants utilized emails between Defendants and legal counsel hired by Defendant to coordinate collection of money from Plaintiffs.

185. Defendants carried out their scheme in different states and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

186. The Defendants knew or should have foreseen that the use of the mails and wires would be required to carry out the scheme.

187. The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate media include, inter alia:

Correspondence and e-mails among the Defendants regarding the scheme and conduct to be undertaken in furtherance of the scheme, calls to Plaintiffs electronic cellular phones and land line phones, making demands for money from Plaintiffs when Plaintiffs did not owe the money to Defendants.

### iii) PATTERN OF RACKETEERING ACTIVITY

188. At various times and places partially enumerated in Plaintiffs' documentary material, all Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

189. Plaintiffs further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their

respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(d) *supra*. In fact, each of the Defendants has committed multiple acts of racketeering activity because thousands of reports were sent via US Mail or e-mails to the same credit bureaus with the false and deceptive information.

190.    Defendants sent correspondence, made phone calls, monthly statements, and other communications to Plaintiffs via US Mail and forwarded financial documents and credit history correspondence to credit bureaus.

191.    These predicate acts directly contributed to the losses and damages sustained by the Plaintiffs.

192.    The multiple acts of racketeering activity described above were committed directly by Defendants or were aided and abetted by one another in the commission of such predicate acts. Each act was related to each other and amounted to and posed a threat of continued racketeering activity constituting a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961 (5).

### iv) DEFENDANTS' CONDUCT CAUSED DIRECT INJURY TO PLAINTIFFS

193.    Plaintiffs have suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment as more fully set forth above.  Specifically, damage to their credit rating, loss of money from garnishments, harassing phone calls and invasion of privacy, and payment of legal defense fees.

194.    As a result of the Defendants' fraudulent scheme, Defendants have obtained money and property that belong to Plaintiffs and the Plaintiffs have been

injured in their business and/or property by the Defendants' overt acts of collection which amount to mail and wire fraud.

*Wherefore,* pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiffs, on behalf of the Rico Subclass, requests judgment against all named Defendants as follows:

1.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d) *supra*.

2.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

3.     That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s).

4.     That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

5.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

6.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

7.      That all Defendants pay to Plaintiffs' costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked.

8.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust for the benefit of Plaintiffs, their heirs and assigns.

9.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues which a jury may lawfully be convened.

Index of Exhibits

Exhibit 1        Complaint against Catherine Kuhn

Exhibit 2        Proof of Claim with exhibits against Mychelle Casel

Exhibit 3        Complaint against Bryan Strohm

Exhibit 4        Asset's supplemental filing in Bryan Strohm bankruptcy

Exhibit 5        Bryan Strohm's second bankruptcy filing

Exhibit 6        Proof of claim against Bryan Strohm

Exhibit 7        Complaint against Shaun Booker

Exhibit 8        Proof of Claim against Lester Rogers

Exhibit 9        Asset's response to request for verification of ownership

Dated: <u>January 15, 2014</u>          Respectfully submitted,

*Frederick D Emhardt*

George M. Plews, Attorney No. 6274-49
Peter M. Racher. Attorney No. 11293-53
Frederick D. Emhardt, Attorney No. 10952-49
Jeffrey A. Townsend, Attorney No. 14082-49
Plews Shadley Racher & Braun LLP
1346 North Delaware Street
Indianapolis, IN  46202
Telephone: (317) 637-0700
Fax: (317) 637-0710
Email: gplews@psrb.com
        pracher@psrb.com
        femhardt@psrb.com
        jtownsend@psrb.com


Matthew D. Boruta, Bar No.  20803-49
CHEESEBOUROUGH & BORUTA
543 East Market Street
Indianapolis, Indiana 46204
Telephone: (317) 637-7000
Fax: (317) 638-2707
Email: boruta17@hotmail.com

Robert D. Cheesebourough, Bar No. 18241-53
CHEESEBOUROUGH & BORUTA
543 East Market Street
Indianapolis, Indiana 46204
Telephone: (317) 637-7000
Fax: (317) 638-2707
Email: rdc@home-saver.org