UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CATHERINE KUHN, MYCHELLE CASEL; BRYAN STROHM; SHAUN BOOKER; LESTER ROGERS; Individually and on behalf of other similarly situated | ) ) ) ) | Case No. 1:14-cv-0059 TWP-DML |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ASSET ACCEPTANCE CAPITAL CORP.; ASSET ACCEPTANCE LLC; ASSET ACCEPTANCE RECOVERY SERVICES LLC; LEGAL RECOVERY SOLUTIONS LLC; ENCORE CAPITAL GROUP INC; and JOHN DOES 1-50 | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

Defendants, Asset Acceptance Capital Corp., Asset Acceptance LLC ("Asset"), Asset Acceptance Recovery Services LLC, Legal Recovery Solutions LLC, and Encore Capital Group Inc. (Collectively "Defendants"), by their attorneys, David M. Schultz, John P. Ryan, Jennifer Kalas and Katherine H. Tresley, and for their Answer and Affirmative Defenses to Plaintiff's Amended Class Action Complaint state as follows:

## INTRODUCTION

1.     This action arises out of Asset Acceptance's improper conduct in a scheme to manipulate consumers to pay money on alleged debt obligations that are not owed to Asset. Asset Acceptance has wrongfully collected from Indiana Consumers tens of millions of dollars. Asset Acceptance continues to wrongfully collect to this day and the foreseeable future.

**ANSWER:**   Defendants deny the allegations in ¶1.

2.      Asset Acceptance buys data reflecting Plaintiffs' past credit card activity and nonpublic personal information. Asset Acceptance does not acquire legal ownership of plaintiffs' debt obligations.

**ANSWER:**   Asset admits that it receives information regarding the accounts it purchases, but, denies the remaining allegations in ¶2.  The remaining Defendants deny the allegations in ¶2.

3.      Until recently, no Asset Entity was licensed or registered in the State of Indiana to do business or to collect debts.  Prior to becoming licensed or registered, the Asset Entities engaged in their collection activities in the State of Indiana.

**ANSWER:**   The Court granted Defendants motion to dismiss Plaintiffs' claim regarding licensing, so no response is required. To the extent that a response is required, Defendants deny the allegations in ¶3.

4.      Asset Acceptance regularly purchases data about Indiana charged-off consumer credit card accounts.

**ANSWER:**   Asset admits that it receives information regarding the accounts it purchases, but, denies the remaining allegations in ¶4.  The remaining Defendants deny the allegations in ¶4.

5.      Defendants, through Asset or Asset's agents, then improperly collect money from Indiana consumers on the information contained in the data for a fee.

**ANSWER:**   Defendants deny the allegations in ¶5.

2

6.      In its collection activities in Indiana, directly or through its collection agents, Defendants falsely represent that Asset has the absolute right to collect money including pre-purchase interest.

**ANSWER:**   Defendants deny the allegations in ¶6.

7.      This class action seeks to recover the monies improperly collected from Indiana consumers by Asset and Defendants, through Asset and Asset's agents, through fraudulent means and in violation of the FDCPA, RICO, and common law fraud. This class action further seeks to recover such monies under the theories of unjust enrichment and restitution.

**ANSWER:**   Defendants admit that the allegations in ¶7 attempt to summarize Plaintiffs' claims, but, Defendants deny that Plaintiffs' have such claims.

8.      Defendants, through Asset and Asset's agents, have engaged in fraudulent collection activities by impermissibly pulling credit reports, performing manual and automated outbound dialer calling activity, sending dunning letters, and filing lawsuits against Indiana residents when Asset has no legal ownership of a debt. As such, Plaintiffs, on behalf of the putative subclass, seek statutory damages under the FDCPA.

**ANSWER:**   Asset admits that either it or its agents attempted to contacted Plaintiffs via the telephone or by letter.  Asset further admits that its attorneys filed lawsuits in Indiana state court against Plaintiffs, but Asset denies the remaining allegations in ¶8.  The remaining Defendants deny all the allegations in ¶8.

9.      Pursuant to RICO, 18 U.S.C. §§ 1961, 1962 (c) and (d) and 1964 (c), Plaintiffs on behalf of the putative subclass, seek treble damages sustained as a result of Defendants' schemes and artifices to defraud, acts of mail fraud (18 U.S.C. §§ 1341), wire fraud (18 U.S.C. §1343), interstate transportation of stolen property (pursuant to 18 USC §2314), and extortion (18 U.S.C.

§1951).  Plaintiffs together seek disgorgement of Defendants' profits under 18 U.S.C. § 1964(a) as the wrongful conduct continues since the filing of the original complaint.

**ANSWER:**    Defendants admit that Plaintiffs attempt to summarize certain aspects of their claims in ¶9, but Defendants deny that Plaintiffs have any such claims.

10.    Plaintiffs further seek judgment ordering Asset Acceptance to disgorge the ill-gotten monies under common law fraud, restitution, and unjust enrichment and requiring Defendants to return the total amount of dollars collected from the putative subclass members over the past six years, plus treble damages.

**ANSWER:**    Defendants admit that Plaintiffs attempt to summarize certain aspects of their claims in ¶10, but Defendants deny that Plaintiffs have any such claims.

11.    Plaintiffs further seek a judgment declaring that Plaintiffs are under no obligation to render payment to any Defendant arising from alleged money that Defendants may claim is owed to them.

**ANSWER:**    Defendants admit that Plaintiffs attempt to summarize certain aspects of their claims in ¶11, but Defendants deny that Plaintiffs have any such claims.

12.    Encore has contracted with AACC to manage the purchase and collections of data.  AACC employs Asset as a purchasing vehicle of the data.  AACC employs LRS to hold the data.  AACC employs Asset in traditional collection methods which are carried out by Asset or Asset employs both Indiana and out-of-state law firms and collection agencies.  AACC employs AARS to manage the legal collections.  AARS employs both Indiana and out-of- state law firms to file lawsuits.

**ANSWER:**    Defendants deny the allegations in ¶12.

131087087v2 0956854

13.     Under the Third Restatement of Agency and *respondeat superior*, each named Defendant, known and unknown, is jointly and severally liable for the improper acts of Asset and the collection companies and law firms that Asset and AARS hire to harass Indiana consumers under the false pretenses of a debt.

**ANSWER:**     The allegations in ¶13 qualify as a legal conclusion for which no response is required.  To the extent a response is required, the Defendants deny the allegations in ¶13.

14.     Since September 2002, Defendants, through Asset and Asset's agents, have initiated hundreds of thousands of consumer credit actions including dunning letters, telephone calls, reports to credit rating agencies.  Defendants, through Asset, AARS, and AARS' network of law firms, have filed tens of thousands of collection lawsuits which have wrongfully restrained bank accounts, garnished wages, placed liens on property, and/or pressured Indiana consumers into payment plans. The alleged debts and judgments procured by Asset appear on consumer credit reports and prevent Indiana consumers from obtaining housing, employment, insurance and affordable credit.

**ANSWER:**     Asset admits that its attorneys have filed lawsuits against consumers in Indiana.  Asset further admits that after their attorneys obtained judgment, they will use Indiana rules of civil procedure to enforce the judgment if the judgment is not paid.  Asset further admits that it sent letters and made telephone calls in its business practice, but denies the remaining allegations in ¶14.  The remaining Defendants deny the allegations in ¶14.

15.     In the Indiana traditional collection activities (letters and telephone calls) initiated by Asset and Asset's agents, Asset possesses no proof of the alleged debt other than a printout of data provided by a third party.  Asset Acceptance purchases data only, not the actual underlying debt obligations or receivables.

**ANSWER:**   Asset denies the allegations in ¶15.  To the extent a response is required from the remaining Defendants, the remaining Defendants deny the allegations in ¶15.

16.     In the Indiana lawsuits initiated by Asset, Asset possesses no proof of the alleged debt other than a false affidavit created by a subcontracted law firm and signed by an Asset employee based entirely on a printout of data provided by a third party rather than personal knowledge.  Asset Acceptance purchases data only, not the actual underlying debt obligations or receivables.

**ANSWER:**   Asset denies the allegations in ¶16.  To the extent a response is required from the remaining Defendants, the remaining Defendants deny that it performs any of these actions and therefore denies the allegations in ¶16.

17.     In both the traditional and legal collection activities, Asset Acceptance demands interest prior to the purchasing of the data which had been previously waived by the originating bank.

**ANSWER:**   Asset denies the allegations in ¶17.  To the extent a response is required from the remaining Defendants, the remaining Defendants deny that it performs any of these actions and therefore denies the allegations in ¶17.

**JURISDICTION & VENUE**

18.     This Court has jurisdiction over Defendants under 15 U.S.C. § 1692k(d) and 28 U.S.C. §§ 1331, 1337, 1367 because Plaintiffs' claims constitute a federal question arising under the FDCPA.

**ANSWER:**   Defendants admit that Plaintiffs ask this Court to have subject matter jurisdiction over federal questions arising from Plaintiffs' alleged FDCPA claims and supplemental jurisdiction over the state law claims, but Defendants deny that Plaintiffs have such claims and deny the remaining allegations in ¶18.

131087087v2 0956854

19.     Venue in this district is proper because Plaintiffs reside here, Defendants do business in this district, and Defendants have significant contacts with the district pursuant to 28 U.S.C. § 1391.

**ANSWER:**     Defendants do not object to venue, but deny Plaintiffs' allegations that Defendants have significant contacts in Indiana.

20.     This Court has jurisdiction over Defendants under 28 U.S.C. § 1332(a) because the total amount in controversy for this class action exceeds $75,000 exclusive of interest and costs.  This Court has jurisdiction over Defendants under 28 U.S.C. § 1332(d) because the total amount in controversy for this class action exceeds $5,000,000 exclusive of interest and costs, and a member of the class is a citizen of a State different from a Defendant.

**ANSWER:**     Defendants deny that the Court has exercised its subject matter jurisdiction under CAFA.

21.     This Court has nationwide jurisdiction over Defendants under RICO, 18 U.S.C. §§ 1961, 1962(c) & (d) and 1964(c).

**ANSWER:**     Defendants admit that the allegations in ¶22 attempt to surmise a certain section of RICO, but Defendants deny there is a claim under RICO and therefore deny the allegations in ¶21.

22.     Pursuant to 18 U.S.C. §1965(b), RICO contains an explicit grant of nationwide service over all Defendants.

**ANSWER:**     Defendants admit that the allegations in ¶22 attempt to surmise a certain section of RICO, but Defendants deny there is a claim under RICO and therefore deny the allegations in ¶22.

23.    This Court has jurisdiction over Defendants under theories of alter ego, agency and veil piercing.

**ANSWER:**    Defendants deny the allegations in ¶23.

24.    This Court has jurisdiction over Asset by virtue of Asset's collection activities within Indiana including direct contact to consumers and initiation of litigation within the State.

**ANSWER:**    Asset does not contest personal jurisdiction, but denies the allegations in ¶24.

25.    This Court has jurisdiction over AARS by virtue of AARS's collection activities within Indiana including initiation of litigation within the state and as an alter ego of Asset.

**ANSWER:**    AARS denies the allegations in ¶25.  Asset denies that AARS is the alter ego of Asset and therefore denies the allegations in ¶25.

26.    This Court has jurisdiction over Encore and AACC which are parent companies and alter egos of Asset, AARS, and LRS.

**ANSWER:**    Defendants deny the allegations in ¶26.

27.    This Court has jurisdiction over LRS as the alter ego of Asset and AARS, and under the theory of *respondeat superior*.

**ANSWER:**    LRS denies the allegations in ¶27.  Asset and AARS deny that LRS is the alter ego of Asset and AARS and denies the remaining allegations in ¶27.

## PARTIES

### Plaintiffs

28.    Plaintiff Catherine Kuhn is a natural person and citizen of the State of Indiana, residing in Hamilton County.  Catherine has been the victim of Asset Acceptance's illegal collection activities concerning an alleged Fifth Third Bank credit card debt.  Catherine was sued by Asset.  Catherine is a "consumer" as that term is defined at 15 U.S.C. § 1692a(3).  Catherine

8

was forced to hire legal counsel to contest the unlawful collection activity. Documents showing illegal collection activities against Catherine were attached as Dkt. 1, Exhibit 1.

**ANSWER:**   Asset admits that its attorneys filed a lawsuit against Ms. Kuhn in Indiana State Court. In further answer, Asset lacks knowledge and information sufficient to form a belief about the location of Ms. Kuhn's current citizenship and residence. In further answer, the allegation that Ms. Kuhn is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Asset lacks knowledge and information sufficient to form a belief about whether Ms. Kuhn qualifies as a consumer because Asset does not know the purpose for why the amounts owed accrued. Asset denies the remaining allegations in ¶28.

**ANSWER:**   These allegations are only directed at Asset, so no response should be required from the remaining Defendants. However, to the extent that a response is needed from the remaining Defendants, they respond as follows: the remaining Defendants lack knowledge and information sufficient to form a belief about the location of Ms. Kuhn's current citizenship and residence. In further answer, the allegation that Ms. Kuhn is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Defendants lack knowledge and information sufficient to form a belief about whether Ms. Kuhn qualifies as a consumer because Defendants does not know the purpose for why the amounts owed accrued. The remaining Defendants deny the remaining allegations in ¶28.

29.   Plaintiff, Mychelle Casel, is a natural person and citizen of Indiana residing in Hendricks County. Mychelle has been the victim of Asset Acceptance's illegal collection activities concerning an alleged Capital One Bank NA credit card debt. Despite Mychelle paying off the Capital One account in 2004, Asset appears on her credit report. Mychelle is a

131087087v2 0956854

"consumer" as that term is defined at 15 U.S.C. § 1692a(3). Mychelle was forced to hire legal counsel to contest the unlawful collection activity. Documents showing illegal collection activities against Mychelle were attached as Dkt. 1, Exhibit 2.

     **ANSWER:**   Asset lacks knowledge and information sufficient to form a belief about the location of Ms. Casel's current citizenship and residence. In further answer, the allegation that Ms. Casel is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Asset lacks knowledge and information sufficient to form a belief about whether Ms. Casel qualifies as a consumer because Asset does not know the purpose for why the amounts owed accrued.  Asset denies the remaining allegations in ¶29.

     **ANSWER:**   These allegations are only directed at Asset, so no response should be required from the remaining Defendants.  However, to the extent that a response is needed from the remaining Defendants, they respond as follows: the remaining Defendants lack knowledge and information sufficient to form a belief about the location of Ms. Casel's current citizenship and residence. In further answer, the allegation that Ms. Casel is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Defendants lack knowledge and information sufficient to form a belief about whether Ms. Casel qualifies as a consumer because Defendants does not know the purpose for why the amounts owed accrued.  The remaining Defendants deny the remaining allegations in ¶29.

     30.    Plaintiff, Bryan Strohm, is a natural person and citizen of Indiana, residing in Monroe County.  Bryan has been the victim of Asset Acceptance's illegal collection activities concerning an alleged First USA/Chase Bank NA and a BP/Chase Bank NA credit card account. Bryan received collection letters and phone calls from Asset and Asset's agents. Bryan is a "consumer" as that term is defined at 15 U.S.C. § 1692a(3). Bryan was forced to hire legal

131087087v2 0956854

counsel to contest the unlawful collection activity. Documents showing illegal collection activities against Bryan were attached as Dkt. 1, Exhibits 3-6.

**ANSWER:**    Asset admits that it attempted to contact Mr. Strohm regarding money that he owes. In further answer, Asset lacks knowledge and information sufficient to form a belief about the location of Mr. Strohm's current citizenship and residence. In further answer, the allegation that Mr. Strohm is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Asset lacks knowledge and information sufficient to form a belief about whether Mr. Strohm qualifies as a consumer because Asset does not know the purpose for why the amounts owed accrued.  Asset denies the remaining allegations in ¶30.

**ANSWER:**    These allegations are only directed at Asset, so no response should be required from the remaining Defendants.  However, to the extent that a response is needed from the remaining Defendants, they respond as follows: the remaining Defendants lack knowledge and information sufficient to form a belief about the location of Mr. Strohm's current citizenship and residence. In further answer, the allegation that Mr. Strohm is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Defendants lack knowledge and information sufficient to form a belief about whether Mr. Strohm qualifies as a consumer because Defendants does not know the purpose for why the amounts owed accrued.  The remaining Defendants deny the remaining allegations in ¶30.

31.    Plaintiff, Shaun Booker, is a natural person and citizen of the State of Indiana, residing in Marion County.  Shaun has been the victim of Asset Acceptance's illegal collection activities concerning an alleged First USA/Chase Bank USA NA credit card account. Shaun was sued by Asset.  Shaun is a "consumer" as that term is defined at 15 U.S.C. § 1692a(3).    Shaun

131087087v2 0956854

was forced to hire legal counsel to contest the unlawful collection activity.  Documents showing illegal collection activities against Shaun were attached as Dkt. 1, Exhibit 7.

**ANSWER:**   Asset lacks knowledge and information sufficient to form a belief about the location of Mr. Booker's current citizenship and residence. In further answer, the allegation that Mr. Booker is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Asset lacks knowledge and information sufficient to form a belief about the truth of whether Mr. Booker qualifies as a consumer because Asset does not know the purpose for why the amounts owed accrued.  Asset denies the remaining allegations in ¶31.

**ANSWER:**   These allegations are only directed at Asset, so no response should be required from the remaining Defendants.  However, to the extent that a response is needed from the remaining Defendants, they respond as follows: the remaining Defendants lack knowledge and information sufficient to form a belief about the truth of the location of Mr. Booker's current citizenship and residence. In further answer, the allegation that Mr. Booker is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Defendants lack knowledge and information sufficient to form a belief about whether Mr. Booker qualifies as a consumer because Defendants does not know the purpose for why the amounts owed accrued.  The remaining Defendants deny the remaining allegations in ¶31.

32.     Plaintiff, Lester Rogers, is a natural person and citizen of the State of Indiana, residing in Marion County.  Lester has been the victim of Asset Acceptance's illegal collection activities concerning an alleged HH Gregg/GE Money Bank credit card account. Asset appears on Lester's credit reports.  Lester is a "consumer" as that term is defined at 15 USC 1692a(3).

12

131087087v2 0956854

Lester was forced to hire legal counsel to contest the unlawful collection activity. Documents showing illegal collection activities against Lester were attached as Dkt. 1, Exhibits 8, 9.

> **ANSWER:** Asset lacks knowledge and information sufficient to form a belief about the truth of the location of Mr. Rogers' current citizenship and residence. In further answer, the allegation that Mr. Rogers is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Asset lacks knowledge and information sufficient to form a belief about the truth of whether Mr. Rogers qualifies as a consumer because Asset does not know the purpose for why the amounts owed accrued. Asset denies the remaining allegations in ¶32.

> **ANSWER:** These allegations are only directed at Asset, so no response should be required from the remaining Defendants. However, to the extent that a response is needed from the remaining Defendants, they respond as follows: the remaining Defendants lack knowledge and information sufficient to form a belief about the location of Mr. Rogers' current citizenship and residence. In further answer, the allegation that Mr. Rogers is a consumer amounts to a legal conclusion, for which no response is required, but to the extent that a response is required, Defendants lack knowledge and information sufficient to form a belief about whether Mr. Rogers qualifies as a consumer because Defendants does not know the purpose for why the amounts owed accrued. The remaining Defendants deny the remaining allegations in ¶32.

### Defendants

33. Defendant Encore is a Delaware corporation which owns, controls, and employs AACC and its subsidiaries Asset, AARS, and LRS. Encore is primarily engaged in the business of purchasing, and collecting on, data containing information about Indiana consumer accounts via mail, telephone, internet and civil debt collection lawsuits. Encore is a "debt collector" as

13

defined by the FDCPA, 15 U.S.C. § 1692a(6).  The business address for Encore is 3111 Camino Del Rio North, Suite 1300, San Diego, CA 92108.

**ANSWER:**   Encore admits that it is a Delaware corporation and that it has office in San Diego at 3111 Camino Del Rio North, but denies the remaining allegations in ¶33.

34.    Defendant AACC is a Delaware corporation.    AACC is a wholly-owned subsidiary of Encore as of June 2013.  Encore has entered into a management servicing contract with AACC to operate and manage AACC's wholly-owned subsidiaries (Asset, AARS, and LRS) as a standalone company.  Through its ownership, control and employment of its subsidiaries, AACC is primarily engaged in the business of purchasing, and collecting on, data containing information about Indiana consumers accounts via mail, telephone, internet, and civil debt collection lawsuits.  AACC is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6). From January 1, 2006 through December 31, 2012, AACC invested approximately $1 billion in the acquisition of charged-off accounts, representing over $33.0 billion in face value of accounts and tens of millions of consumer accounts.  The business address for AACC is 28405 Van Dyke Avenue, Warren, MI 48093.

**ANSWER:**    AACC admits that it is a wholly owned subsidiary of Encore and that it has an office at 28405 Van Dyke Avenue, Warren, MI 48093.  AACC further admits that it is a "standalone company", but denies the remaining allegations in ¶34.

35.    Defendant Asset is a Delaware limited liability company formed in 2002.   Asset is a wholly-owned subsidiary of AACC.  Asset serves as the purchasing vehicle of "data" as well as the servicer of the data.  Asset is primarily engaged in the business of purchasing and collecting on data containing information about Indiana consumer accounts via mail, telephone, internet and civil debt collection lawsuits.  Asset is a "debt collector" as defined by the FDCPA,

14

15 U.S.C. § 1692a(6).  Despite being named as "creditor" in tens of thousands of traditional collection activities (letters and telephone calls) and being named plaintiff in thousands of lawsuits in Indiana, Asset is not licensed as a collection agency in Indiana. Despite being named the plaintiff in thousands of collection lawsuits filed in Indiana, Asset was not registered to conduct business in Indiana until June 29, 2012.  The business address for Asset is 28405 Van Dyke Avenue, Warren, MI 48093.

**ANSWER:**   Asset admits it is a Delaware LLC, which was formed in 2002.  In further answer, Asset admits that it is a wholly owned subsidiary of AACC and that it has an office at 28405 Van Dyke Avenue, Warren, MI 48093.  In further answer, Asset admits that its attorneys sometimes file lawsuits in Indiana, but Asset denies that it is required to obtain a license in Indiana and denies the remaining allegations in ¶35.

36.     Defendant AARS is a Delaware limited liability company formed in December 2010.  AARS is a wholly-owned subsidiary of AACC.  AARS's sole purpose is to manage Asset Acceptance's network of collection law firms.  AARS provides legal collection management services to Asset.  AARS is primarily engaged in the business of purchasing and collecting on data containing information about Indiana consumer accounts via mail, telephone, internet and civil debt collection lawsuits. AARS is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).  AARS licensed itself as a collection agency in the State of Indiana on July 31, 2013. The business address for AARS is 28405 Van Dyke Avenue, Warren, MI 48093.

**ANSWER:**   AARS admits it is a Delaware LLC.  In further answer, AARS admits that it is a wholly owned subsidiary of AACC and that it has an office at 28405 Van Dyke Avenue, Warren, MI.  In further answer, AARS admits that it holds a license in Indiana, but denies the remaining allegations in ¶36.

131087087v2 0956854

37.     Defendant LRS is a Delaware limited liability company. LRS is a wholly-owned subsidiary of AACC.  LRS is the holding vehicle of the data purchased by Asset. LRS is a software technology company which manages the data inventory in both traditional collections and litigation. LRS is primarily engaged in the business of purchasing and collecting on data containing information about Indiana consumer accounts via mail, telephone, internet and civil debt collection lawsuits. LRS is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).  The business address for LRS is 28405 Van Dyke Avenue, Warren, MI 48093.

**ANSWER:**     LRS admits it is a Delaware LLC.  In further answer, LRS admits that it is a wholly owned subsidiary of AACC and that it has an office at 28405 Van Dyke Avenue, Warren, MI, but denies the remaining allegations in ¶37.

38.     Asset Acceptance, through its agents Asset, AARS, and LRS, employs subcontractors such as law firms and collection agencies to find consumers through skip tracing and to collect on the alleged debts. These subcontractors enter into a Collection Services Agreement with Asset Acceptance.

**ANSWER:**     Asset admits that on certain occasions and under certain circumstances it employs third-party independent contractors to collect money that it is owed, which from time to time will use skip tracing services, but denies the remaining allegations in ¶38.

**ANSWER:**     To the extent a response is required from the remaining Defendants, the remaining Defendants deny that they attempted to or that they hired someone to collect any money from the Plaintiffs and therefore deny the allegations in ¶38.

39.     Encore ultimately operates and manages AACC, Asset, AARS, and LRS.  Encore has entered into a managerial services contract with AACC.  AACC manages the financing and purchasing of data as well as the servicing of the data. AACC uses Asset as the purchasing

131087087v2 0956854

vehicle and LRS is the holding vehicle of the data. AACC has subcontracted the telephone calls and lettering collections servicing of the data to Asset. When data is sent to the legal collections channel, AACC subcontracts to AARS to manage the network of law firms.

**ANSWER:** Defendants deny the allegations in ¶39.

## FACTUAL ALLEGATIONS

40. Consumer awareness and the legal system have not fully comprehended the two game changing evolutions that have greatly altered the world's financial landscape: (1) Securitization and (2) Credit Enhancements.

**ANSWER:** Defendants deny the allegations in ¶40.

41. The originating bank, through subsidiaries, pools the credit card receivables into a financial instrument that can be sold to outside investors, a process called "securitization," which results in the creation of an asset-backed security.

**ANSWER:** Defendants admit that credit cards are often securitized, but Defendants deny the remaining allegations in ¶41 as the allegations fail to properly and accurately depict the securitization process.

42. The asset-backed security and prospectus are registered with the Securities and Exchange Commission ("SEC"). These documents specifically state that the receivables are sold and transferred to the trust; however, the documents are not stamped or marked to reflect the transfer but instead the computer records are marked as evidence of the transfer.

**ANSWER:** Defendants admit that certain documents containing certain information regarding securitized credit cards are filed with the SEC, but Defendants deny the remaining allegations in ¶42 as the allegations fail to properly and accurately depict the securitization process

131087087v2 0956854

43.     The main results of securitization are: 1) the originating bank is paid in full; 2) the originating bank surrenders all control and ownership including all rights, title, and interest over the receivables; 3) the outside investors own the receivables as result of a true sale; 4) evidence of indebtedness is delivered to the Trustee; 5) the originating bank transforms into the servicer for the asset-backed security; and 6) the originating bank cannot get the receivables back without violating IRS, SEC, and accounting rules (ASC Topics 860 & 810 formerly Financial Accounting Standards Board Statement No. 166-167).

**ANSWER:**   Defendants admit that credit cards are often securitized, but Defendants deny the allegations in ¶43 because the allegations not properly and accurately depict the securitization process.

44.     Credit enhancements are a key part of the securitization process since they are guarantees that the risk-averse investors will get paid in full if there is a default of the receivables.

**ANSWER:**   Defendants deny the allegations in ¶44.

45.     Upon non-payment, the asset-backed security servicer has 180 days to collect upon the receivable. If the servicer is unsuccessful, the debt is considered "charged off".  That means that the servicer informs the investor of the credit event; the credit enhancements are "tapped"; and, the investor is paid in full.  Since the investor is paid in full, there is no longer a debt obligation. The left over data is what is purchased and serviced by Asset Acceptance.

**ANSWER:**   Defendants deny the allegations in ¶45.

46.     While ASC Topics 860 & 810 prohibits the originating bank from repurchasing the defaulted receivables back from the Trust, it does not prohibit the sale of information/data about the defaulted receivable.  This data containing nonpublic personal information is not

131087087v2 0956854

evidence of indebtedness. The Bill of Sale and Purchase Agreements specifically limit the sale to the originating bank's interest in the receivable, which after securitization and credit enhancements is solely the data not ownership of the receivable.[1]

**ANSWER:**   Defendants deny the allegations in ¶46.  The footnote to ¶46 amounts to a legal conclusion for which no response is required, but to the extent that a response is required Defendants admit that Plaintiffs attempt to paraphrase a certain portion of the GLBA, but deny Plaintiffs properly and accurately depict the requirements and/or purpose of the GLBA.

47.     All the Plaintiffs credit card receivables were securitized by the originating banks, charged off, and "insured" by credit enhancements.

**ANSWER:**   Upon information and belief, Defendants admit that the original banks placed Plaintiffs' credit cards in a security pool and when the accounts were in default, the original creditor considered them charged-off, but, Defendants deny the remaining allegations in ¶47.

### Plaintiffs' Interactions with Defendants

### Catherine Kuhn

48.     Catherine Kuhn had a decrease in income. In 2007, Catherine was not able to maintain payments on her Fifth Third credit card.  After 180 days of default, Fifth Third charged-off the credit card debt and stopped sending monthly statements.

---

[1] However, the Graham-Leach-Bliley Act ("GLBA") still requires an initial privacy notice, opt-out notice, and annual notice regarding nonpublic personal information. (Defendants sometimes provide the initial privacy notice but do not comply with the other requirements). GLBA includes "debt buyers" and has civil and criminal penalties for noncompliance.

131087087v2 0956854

**ANSWER:**   Asset admits that Ms. Kuhn stopped making payments on her Fifth Third credit card, that Fifth Third charged-off the account and thereafter, stopped sending monthly statements.  However, Asset lacks knowledge and information to form a belief about the truth of whether Ms. Kuhn's income decreased.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

49.   Unbeknownst to Catherine, her Fifth Third data was sold to Asset.

**ANSWER:**   Asset admits that Fifth Third sold Ms. Kuhn's entire account to Asset, but, Asset denies the remaining allegations in ¶49.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

50.   On May 3, 2012, a lawsuit was filed in Hamilton County Circuit Court via mail by Greene & Cooper LLP on behalf of Asset against Catherine. However, the notice of the Complaint was mailed to an address Catherine no longer resided in. After the third alias summons, Catherine finally received the Complaint in November 2013.

**ANSWER:**   Asset admits that its attorneys filed suit against Ms. Kuhn on May 3, 2012 in Hamilton County Circuit Court and that Ms. Kuhn was official served on November 4, 2013. Upon information and belief, Asset denies the remaining allegations in ¶50.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

131087087v2 0956854

51.    Catherine never received the Defendants' collection activity as the Defendants did not have her current address.

**ANSWER:**    Asset denies the allegations in ¶51.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶51 as they were not a party and they were not involved in the lawsuit or the service of the complaint.

52.    The Complaint contained the false statements that Catherine "is indebted to" Asset on an outstanding balance of $1832.12.

**ANSWER:**    Asset denies the allegations in ¶52.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶52 as they were not a party and they were not involved in the lawsuit.

53.    The only evidence attached to the Complaint was a fill-in-the-blank Affidavit of Debt executed by an employee of Asset falsely stating that Catherine was indebted to Asset.  The Complaint had no other proof of indebtedness.

**ANSWER:**    Asset denies the allegations in ¶53.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶53 as they were not a party and they were not involved in the lawsuit.

54.    Fearing garnishment, Catherine sought and retained legal counsel.  At which time, Catherine pulled a credit report and monthly reports were furnished to the credit bureaus including in the calendar year 2013.

**ANSWER:**    Asset admits that Ms. Kuhn retained counsel and that her account was reported delinquent to the credit bureaus, but Asset denies the remainder of the allegations in the first sentence of ¶54.  Asset lacks knowledge and information to form a belief regarding whether and/or when Ms. Kuhn "pulled [her] credit report."

**ANSWER:**    The remaining Defendants also deny the allegations in ¶54 as they were not a party and they were not involved in the lawsuit or credit reporting.   In further answer, Defendants lack knowledge and information to form a belief regarding whether and/or when Ms. Kuhn "pulled [her] credit report."

55.    On or about August 17, 2011, Asset electronically furnished a report to consumer credit reporting agencies, Experian Plc ("Experian") (with corporate headquarters in Dublin Ireland and operational headquarters in Costa Mesa CA, Sao Paulo Brazil, and Nottingham UK), Equifax Inc. ("Equifax") (headquartered in Atlanta, GA), and TransUnion LLC ("TransUnion") (headquartered in Chicago, IL).  The furnished report falsely stated that Catherine owed a debt to Asset.  From August 2011 until December 2013, Asset transmitted monthly updates to each credit reporting agency which alone equated to 87 individual wire transactions.

**ANSWER:**    Asset admits that Ms. Kuhn's account was reported delinquent to the credit bureaus, but Asset denies the remainder of the allegations in ¶55.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶55 as they were not involved in the lawsuit or credit reporting.

56.    The initial credit report states a balance of $2006 despite Asset's Complaint stating a charge off amount of $1780.

**ANSWER:**    Asset denies the allegations in ¶56.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶56 as they were not involved in the lawsuit or credit reporting.

### Mychelle Casel

57.    Mychelle is self-employed and had a decrease in income. In 2006, Mychelle was not able to maintain payments on her Capital One credit card.  After 180 days of default, Capital One charged off her credit card debt and stopped sending monthly statements.

**ANSWER:**    Asset admits that Ms. Casel stopped making payments on her Capital One credit card, that Capital One charged-off the account and that sometime thereafter, stopped sending monthly statements.  However, Asset lacks knowledge and information to form a belief about whether Ms. Casel's income decreased.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

58.    Mychelle's employment gradually increased but by then she was deep in debt. Her creditors refused to work with her and demanded full payment.  Fearing that her monies could be taken, Mychelle retained counsel and filed bankruptcy.

**ANSWER:**    Asset admits that Ms. Casel through her attorney filed several petitions for bankruptcy, but all of them within the last five years have been dismissed.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

59.    Mychelle obtained a credit report which revealed that Asset had electronically furnished monthly updates to Experian, Equifax, and TransUnion from June 2009 to May 2013.

**ANSWER:**    Asset admits that it reported Ms. Casel's account to the credit bureaus, but lacks knowledge and information to form a belief about whether and/or when Ms. Casel obtained her credit report.  Asset denies the remaining allegations in ¶59.

**ANSWER:**    The remaining Defendants also deny the allegations in ¶59 as they were not involved in the lawsuit or credit reporting.

60.    Unbeknownst to Mychelle, her Capital One account data was sold to Asset.

**ANSWER:**   Asset admits that Capital sold Ms. Casel's entire account to Asset, but, Asset denies the remaining allegations in ¶60.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

61.   On September 18, 2013, Asset filed a proof of claim with the US District Bankruptcy Court.  The Claim falsely states that "the debtor owes money" to Asset.

**ANSWER:**   Asset admits that it filed a proof a claim in the bankruptcy court, but, denies the remaining allegations in ¶61.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

62.   Further, the Claim states that the account was charged off on July 3, 2007; the charged off amount was $632.43; Asset had purchased the account on June 18, 2009; and Asset demanded $966.88 interest as of June 18, 2013 computed at 24%.

**ANSWER:**   The Court dismissed this aspect of Ms. Casel's claim, so no response is required to ¶62.

63.   At 24%, interest on $632.43 is $151.78 per year.

**ANSWER:**   The Court dismissed this aspect of Ms. Casel's claim, so no response is required to ¶63.

64.   The $966.88 interest therefore amounted to approximately 6.4 years' worth of interest which would include interest prior to the date on which Asset claims to have purchased the account.

131087087v2 0956854

**ANSWER:**   The Court dismissed this aspect of Ms. Casel's claim, so no response is required to ¶64.

### Bryan Strohm

65.     Bryan Strohm acquired credit card debt including a First USA/Chase Bank and a BP/Chase Bank credit card.   Due to a severe loss in income, Bryan was unable to maintain payments on his credit cards.   After 180 days of default, Chase charged off each credit card debt and stopped sending monthly statements on each credit card.

**ANSWER:**   Asset admits that Mr. Strohm stopped making payments on his Chase Bank credit cards, that Chase charged-off the accounts and that sometime thereafter, Chas stopped sending monthly statements .   However, Asset lacks knowledge and information to form a belief about truth of whether Mr. Strohm's income decreased.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

66.     Unbeknownst to Bryan, on or about October 17, 2008, the First USA account data was sold to Asset.   And on or about November 7, 2008, the BP account data was sold to Asset.

**ANSWER:**   Asset admits that Chase sold both of Mr. Strohm's accounts to Asset, but, Asset denies the remaining allegations in ¶66.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint.   The remaining Defendants adopt the answer provided by Asset.

67.     In November 2008, Asset began monthly to furnish reports to Experian, Equifax, and TransUnion that falsely stated that Bryan owed a debt to Asset on each account.

131087087v2 0956854

**ANSWER:**    Asset admits that it reported Mr. Strohm's accounts to the credit bureaus, but Asset denies the remaining allegations in ¶67.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

68.    Bryan received numerous harassing phone calls to his home phone which are in possession of Asset and Asset's agents.

**ANSWER:**    Asset denies the allegations in ¶68.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

69.    Bryan received numerous collection letters that all falsely stated a "current balance" was owed to Asset and requested pre-purchase interest.

**ANSWER:**    Asset denies the allegations in ¶69.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

70.    Specifically, Asset mailed a collection letter to Bryan on February 1, 2009; October 1, 2010; and October 1, 2011 regarding the First USA account and on December 27, 2008 regarding the BP account.  Each letter falsely stated that there was a "current balance" owed to Asset.

**ANSWER:**    Asset admits that it sent letters to Mr. Strohm regarding the money that he owed to Asset, but denies the remaining allegations in ¶70.

131087087v2 0956854

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

71.   Redline Recovery Services LLC, as Asset's agent, mailed a collection letter to Bryan on February 8 and June 7, 2009 regarding the First USA account.  Each letter falsely stated that there was a "balance" owed to "Asset Acceptance LLC."

**ANSWER:**   Asset denies that Redline Recovery Services LLC was its agent; rather, Redline Recovery Services LLC is an independent contractor.  Asset admits that there were letters sent to Strohm stating that there was money owed to Asset, but Asset denies the remaining allegations in ¶71.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

72.   Lloyd & McDaniel LLP, as Asset's agent, mailed a collection letter to Bryan on November 10, 2009 regarding the BP account and on February 27, 2012 regarding the First USA account.  Each letter falsely stated that there was a "debt" owed to "Asset Acceptance LLC."

**ANSWER:**   Asset denies that Lloyd & McDaniel LLP was its agent; rather, Lloyd & McDaniel LLP is an independent contractor.  Asset admits that there was correspondence with Mr. Strohm regarding how he owed a debt to Asset, but Asset denies the remaining allegations in ¶72.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

131087087v2 0956854

73.     On June 28, 2009, a lawsuit was filed in Monroe Circuit Court via mail by Lloyd & McDaniel on behalf of Asset against Bryan. The Complaint contained the false statements that Bryan was "indebted to" Asset.

**ANSWER:**    Asset admits that its attorneys from Lloyd & McDaniel filed suit against Mr. Strohm, but denies the remaining allegations in ¶73.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

74.     The only evidence attached to the Complaint was a fill-in-the blank Affidavit executed by an employee of Asset falsely stating that Bryan was indebted to Asset.

**ANSWER:**    Asset denies the allegations in ¶74.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

75.     The Complaint further demanded $809.82 in accrued interest calculated at 8% on the charged off amount of $2,022.72. The charge off was March 30, 2007; the alleged date of purchase was November 7, 2008; and the interest was calculated through July 22, 2009. The $809.82 represents 5 years' worth of interest.

**ANSWER:**    The Court dismissed this aspect of Mr. Strohm's claim, so no response is required to ¶75.

76.     The First USA account is even worse.  The account was charged off February 28, 2007.  Strohm stopped receiving monthly statements from Chase.  Strohm received a letters from Enhanced Recovery (4/23/07) and Creditors Financial Group (10/1/07) on behalf of Chase which

131087087v2 0956854

stated amount due the same as the charge-off, $6446.65. Asset claims purchased on October 16, 2008.  However, Strohm received a letter from Asset (2-1-09) asking for $8637.06. That is an increase of $2190.41.  If Asset is correct that charging 8% interest, that interest would amount to 4.25 years' worth of interest and included interest going back to 2005 despite Strohm being current on the account until 2006.  Then on February 8, 2009 (7 days later), the balance had increased from $8637.06 to $8681.56, almost 36 % daily interest. Then on 10-1-10, balance up to $10,528.64, or 7.9 years of interest, which would have started calculating in 2003.  Then on October 1, 2011, the balance is up to $11,733.55 or 10.25 years of interest, which would have started calculating in 2001. Then on February 27, 2012, the balance is mysteriously at $8167.15.

**ANSWER:**   The Court dismissed this aspect of Mr. Strohm's claim, so no response is required to ¶76.

77.    On or about November 14, 2013, Lloyd & McDaniel as Asset's agent filed for a Motion for Proceedings Supplemental via the mail to Monroe Circuit Court in regards to the BP account.

**ANSWER:**   Asset admits that Lloyd & McDaniel took certain actions in the state court litigation in order to recover the money that Mr. Strohm owed to Asset including filing a motion for supplemental proceedings on or about November 14, 2013.  Asset lacks knowledge and information to form a belief about the truth in regard to the exact procedures that Lloyd & McDaniel took to file the motion for supplemental proceedings

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

78.     Fearing loss of "wages, assets, profits, and other non-exempt property", Bryan retained legal counsel and filed for bankruptcy.

**ANSWER:**    Asset admits that Mr. Strohm retained counsel and filed for bankruptcy several times, but the petitions were dismissed.  Asset denies the remaining allegations in ¶78.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

79.     Subsequently, Asset filed a proof of claim for the First USA and BP account with the US Bankruptcy Court on November 20 and 26, 2013.  Each claim falsely states that "Name of Creditor (the person or other entity to whom the debtor owes money or property): Asset Acceptance LLC."

**ANSWER:**    Asset admits that its attorneys filed a proof of claims in bankruptcy court on Mr. Strohm's accounts that Asset owns on November 20 and 26, 2013 and that the filing speaks for themselves, but Asset denies the remaining allegations in ¶79.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

### Shaun Booker

80.     Shaun Booker had acquired credit card debt including a First USA/Chase Bank credit card.  In 2007, Shaun was unable to maintain payments on his credit cards.  After 180 days of default, Chase Bank charged-off the credit card debt.

**ANSWER:**    Asset admits Mr. Booker stopped making payments on his Chase Bank credit card that Chase charged off the account.

131087087v2 0956854

81.     Unbeknownst to Shaun, on or about November 14, 2008, his Chase account data was sold to Asset.

**ANSWER:**    Asset admits that Chase sold Mr. Booker's account to Asset, but, Asset denies the remaining allegations in ¶81.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

82.     The first time Shaun heard of Asset was the receipt of a Complaint filed in Marion Superior Court by Wright & Lerch LLP on behalf of Asset.

**ANSWER:**    Asset denies the allegations in ¶82.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

83.     The Complaint contained the false statements that Shaun "is indebted to" Asset on an outstanding balance of $7402.96 plus interest.

**ANSWER:**    Asset denies the allegations in ¶83.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

84.     The only evidence attached to the Complaint was a fill-in-the-blank Affidavit of Debt executed by an employee of Asset falsely stating that Shaun was indebted to Asset.  The Complaint had no other proof of indebtedness.

**ANSWER:**    Asset denies the allegations in ¶84.

31

131087087v2 0956854

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

85.    Fearing a possible freeze of a bank account or garnishment, Shaun retained legal counsel.

**ANSWER:**   Asset denies the allegations in ¶85.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

**Lester Rogers**

86.    Lester Rogers had acquired credit card debt including a HH Gregg/GE Money Bank credit card.  In 2009, Lester had a decrease in income. After 180 days of default, GE Money Bank charged off the credit card debt.

**ANSWER:**   Asset admits Mr. Rogers stopped making payments on his GE credit card and that GE charged off the account.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

87.    Lester started receiving telephone calls and letters from many alleged creditors. Fearing a loss of monies, Lester retained legal counsel and filed a bankruptcy on February 6, 2013.  However, Lester agreed to pay back the creditors.

**ANSWER:**   Asset lacks knowledge and information to form a belief about whether Mr. Rogers received calls and letters from many alleged creditors.  In further answer, Asset admits

that Mr. Rogers filed a bankruptcy petition on February 6, 2013, but that action has been dismissed and therefore, Asset denies the remaining allegations in ¶87.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

88.   Lester was unaware that his GE Money Bank account data was sold to Asset.

**ANSWER:**   Asset admits that GE sold Mr. Rogers' entire account to it, but denies the remaining allegations in ¶88.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

89.   In February 2013, Lester pulled a credit report from Experian, Equifax, and TransUnion. From May 2010 until February 2013, Asset transmitted monthly updates to each credit reporting agency which alone equated to 102 individual wire transactions.

**ANSWER:**   Asset lacks knowledge and information to form a belief about the truth regarding whether and/or when Mr. Rogers obtained his credit report.  In further answer, Asset admits that it reported Mr. Rogers' account to the credit bureaus, but denies the remaining allegations in ¶89.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

90.     Subsequently, Asset filed a proof of claim with the US District Bankruptcy Court in Indianapolis on April 26, 2013.  The Claim falsely states that "Name of Creditor (the person or other entity to whom the debtor owes money or property):  Asset Acceptance LLC."

**ANSWER:**   Asset admits that its attorney filed in proof of claim in the bankruptcy court on April 26, 2013 and the filing speaks for itself, but denies the remaining allegations in ¶90.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

91.     There was an objection to the proof of claim as well as a request for verification of ownership.  In response, Asset's legal counsel could only produce the electronic data.

**ANSWER:**   Asset admits that there was an objection to the proof of claim that its attorney filed, but denies the remaining allegations in ¶91.

**ANSWER:**   The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

92.     Further, the Claim states that the account was charged off on April 11, 2010; the charged off amount was $2076.97; Asset had purchased the data on May 13, 2010; and Asset demanded $1418.94 interest as of February 6, 2013 computed at 24%.

**ANSWER:**   Asset admits that the proof of claim its attorney filed speaks for itself and Asset denies the allegations to the extent the allegations in ¶92 differ from the proof of claim.

131087087v2 0956854

**ANSWER:** The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

93. At 24%, interest on $2076.97 is $498.47 per year.

**ANSWER:** Asset admits that it charged Mr. Rogers' interest within the confines of the law.

**ANSWER:** The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

94. The $1418.94 interest therefore amounted to approximately 2.85 years' worth of interest which would include 1 month of interest prior to the date on which Asset claims to have purchased the account.

**ANSWER:** Asset denies Mr. Rogers' approximation and denies that it improperly charged him interest.

**ANSWER:** The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

**Mail & Wire Fraud**

95. Defendants devised a scheme to defraud, obtain money or property, and unlawfully transfer the money by means of false or fraudulent pretenses and representations under the guise of "debt buying" and employed the Asset Entities to implement the scheme. Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud the Plaintiffs or to obtain money or property of Plaintiffs by means of false or fraudulent pretenses, representations, or promises. The scheme includes but is not limited to:

35

a.      Purchasing and receiving data from originating banks and other third party "data buyers" without Plaintiffs' knowledge;

b.      Transferring data to a holding vehicle without Plaintiffs' knowledge;

c.       Locating the Plaintiffs by impermissibly pulling credit reports and hiring skip tracers;

d.      Making false reports to credit reporting agencies against the Plaintiffs under the false pretense of a valid debt owed to Asset in violation of the Fair Credit Reporting Act;

e.      Sending collection letters to Plaintiffs under the false pretense of a valid debt owed to Asset;

f.      Hiring subcontractors to send collection letters to Plaintiffs under the false pretense of a valid debt owed to Asset;

g.      Not providing Graham-Leach-Bliley Act ("GLBA") notices;

h.      Providing subcontractors with GLBA notices to mail to Plaintiffs that improperly omitted an opt-out clause for use of Plaintiffs' nonpublic personal information;

i.      Making telephone calls to Plaintiffs under the false pretense of a valid debt owed to Asset;

j.      Hiring subcontractors to make telephone calls to Plaintiffs under the false pretense of a valid debt owed to Asset;

k.      Hiring subcontractors to file lawsuits against Plaintiffs under the false pretense of a valid debt owed to Asset;

l.      Hiring subcontractors to obtain default judgments against Plaintiffs under the false pretense of a valid debt owed to Asset;

m.      Producing and filing fraudulent affidavits against Plaintiffs under the false pretense of a valid debt owed to Asset;

n.      Producing and filing fraudulent proofs of claims in bankruptcy courts against Plaintiffs under the false pretense of a valid debt owed to Asset;

o.      Using judgments obtained against Plaintiffs under the false pretense of a valid debt owed to Asset to freeze bank accounts, put levies on property, and garnish paychecks of Indiana consumer;

131087087v2 0956854

      p.    Reinvesting the monies collected under false pretenses into purchasing more data about charged-off accounts and nonpublic personal information to perpetuate the scheme.

**<u>ANSWER:</u>**    Defendants deny the allegations in ¶95 and its subparagraphs a through p.

96.    Defendants could foresee that the U.S. Postal Service and interstate wires would be "used for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 USC §§1341 and 1343.

**<u>ANSWER:</u>**    Defendants deny the allegations in ¶96.

97.    Defendants, through their agents Asset and AARS, have employed collection agencies and law firms around the country to harass Indiana consumers.

**<u>ANSWER:</u>**    Defendants deny the allegations in ¶97.

98.    Defendants, through their agent Asset, contract with collection agencies to employ traditional collection methods using LRS software. These collection agencies have included, but are not limited to, the following: Redline Recovery Services LLC (Houston TX); Brachfeld Law Group PC (Houston TX and El Segundo CA); Northland Group Inc. (Edina MN); Allied Interstate LLC (Tempe, AZ); Blitt & Gaines PC (Wheeling IL); Mercantile Adjustment Bureau LLC (Rochester NY); CBCS Inc. (Columbus OH); and Accounts Receivable Management Inc. (Thorofare, NJ). (Hereinafter collectively referred to as the "Collection Agency Enterprise.")

**<u>ANSWER:</u>**    Defendants deny the allegations in ¶98.

99.    Defendants, through their agent AARS, contract with law firms, which often previously acted through traditional collection methods, to employ litigation-related collection actions on behalf of Asset using LRS software. These law firms have included, but are not limited to the following: Bowman, Heintz, Boscia & Vician (Chicago & Merrillville & Indianapolis); Greene & Cooper LLP (Louisville KY, Cincinnati OH, Roswell GA); Lloyd & McDaniel PLC (Louisville KY); Wright & Lerch (Fort Wayne); (hereinafter collectively referred

to as the "Law Firm Enterprise").  Some of these law firms, like Greene & Cooper, have their own network of attorneys in various states. The law firms use the wire to conduct skip tracing from sources such as Experian and LexisNexus. The out of state and non-local law firms use the mail to file Complaints, motions for Proceedings Supplemental, and interrogatories to employers with Indiana Courts. The law firms use the wire to contact the Department of Defense's Manpower Data Center in Virginia to check active military status. The out of state law firms often employ their own subcontractors (local attorneys) to appear at court hearings.

**ANSWER:**    Defendants deny the allegations in ¶99.

100.    This litigation-related collection activity names Asset plaintiff and seeks judgment on affidavit produced by the law firm using LRS documents and executed by an Asset employee based not on personal knowledge but data stored at LRS referencing a charged-off account.

**ANSWER:**    Defendants deny the allegations in ¶100.

101.    The U.S. Government has come to the conclusion that the electronic database that the Defendants purchase "does not include account documents such as contracts signed by the consumer" and documents "that may substantiate the portfolio's data does not exist."[2]   The Federal Trade Commission ("FTC")'s complaint charged, amongst other things, misrepresenting that that consumers owed a debt when Asset could not substantiate its representations.

**ANSWER:**    Defendants deny the allegations in ¶101.

102.    Defendants, through their agent Asset, directly engage in collection activity by furnishing reports to Experian, Equifax, and TransUnion.  These reports are produced by Asset based not on personal knowledge but data stored at LRS referencing a charged-off account.

**ANSWER:**    Defendants deny the allegations in ¶102.

---

[2] *United States v. Asset Acceptance*, 8:12-cv-182-T-27Eat (US District Court Middle District Florida January 30, 2012) complaint #11, #13.

103.     Defendants, through their agent Asset, directly engage in collection activity by filing proofs of claim in Indiana bankruptcy courts. These proofs of claim are produced by Asset and executed by a resurgent employee based not on personal knowledge but data stored at LRS referencing a charged-off account.

**ANSWER:**     Defendants deny the allegations in ¶103.

104.     Defendants could foresee that the US Postal Service and interstate wires would be used in every dunning letter, telephone call, credit report, proof of claim, and court judgment and enforcement; and each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and misrepresentations.

**ANSWER:**     Defendants deny the allegations in ¶104.

105.     In particular, Defendants knew or could foresee that the US Postal Service and interstate wires would be used to receive and/or deliver, *inter alia*, communications between Defendants for the purpose of purchasing Plaintiffs' data from originating banks and other third party data buyers; locating the Plaintiffs; outsourcing the collection of Plaintiffs data to third parties, mailing dunning letters to Plaintiffs; telephone calls to Plaintiffs' home, cell, and work numbers; furnishing reports about Plaintiffs to credit reporting agencies; and filing lawsuits against Plaintiff's in furtherance of the fraudulent scheme.

**ANSWER:**     Defendants deny the allegations in ¶105

106.     Each and every Defendant has specific knowledge that the mails and wires are being utilized it furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used. Without the use of the mails

and wires, Defendants could not have made contact with Indiana consumers nor received money from Indiana consumers.

**ANSWER:**     Defendants deny the allegations in ¶106.

107.    Defendants, acting singly and in concert, personally or through their agents, used the US Postal Service and interstate wires or caused the US Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Indiana consumers within the meaning of 18 USC §§1341 and 1343.

**ANSWER:**     Defendants deny the allegations in ¶107.

108.    It is not possible for Plaintiffs to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants and their agents.

**ANSWER:**     Defendants deny the allegations in ¶108.

109.    By way of example, Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, and members of the Collection Agency Enterprise), specifically used the US Postal Service or interstate wires or caused the US Postal Service or interstate wires to deliver each and every telephone call, email, and letter described in paragraphs 48-94, including but not limited to those detailed in the below chart, for the purpose of advancing, furthering, executing, and concealing the scheme to defraud Plaintiffs.

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| **Catherine Kuhn Communications** | | | | |
| Wire | 8/17/11 | Asset – MI | Equifax – GA | Furnish false report that debt owed to Asset & balance including pre-purchase interest |
| Wire | 1/9/12 | Asset - MI | Greene & Cooper - KY | Affidavit falsely stating that there is a debt owed to Asset and signed without personal knowledge |
| Mail | 4/30/12 | Greene & Cooper – KY | Hamilton Cir. Ct - IN | File complaint falsely stating that debt owed to Asset |
| Mail | 6/18/13 | Greene & Cooper – KY | Hamilton Cir. Ct - IN | File alias summons falsely stating that debt owed to Asset |
| Mail | 11/1/13 | Greene & Cooper - KY | Hamilton Cir. Ct - IN | File alias summons falsely stating that debt owed to Asset |
| **Mychelle Casel Communications** | | | | |
| Wire | 3/11/09 | Capital One – VA | Asset - MI | Purchase Agreement of Charged-off Accounts |
| Wire | 6/18/09 | Capital One - VA | Asset - MI | Transfer of Mychelle's NPI |
| Wire | 6/18/09 | Asset – MI | LRS - PA | Transfer of Mychelle's NPI |
| Wire | 9/18/13 | Asset – MI | US Court – IN | File proof of claim falsely stating debt owed to Asset including pre-purchase interest |

41

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
|  | **Bryan Strohm Communications** |||||
| Wire | 10/17/08 | Chase – NY | Asset – MI | Purchase of Bryan's NPI |
| Wire | 10/17/08 | Asset – MI | LRS – PA | Transfer of Bryan's NPI |
| Mail | 10/27/08 | Asset – FL | Strohm – FL | Collection letter falsely stating debt owed to Asset & demanding pre-purchase interest |
| Wire | 11/7/08 | Chase – NY | Asset – MI | Purchase of Bryan's NPI |
| Wire | 11/7/08 | Asset – MI | LRS – PA | Transfer of Bryan's NPI |
| Mail | 2/1/09 | Asset – OH | Strohm - IN | Collection letter falsely stating debt owed to Asset |
| Wire | 2/3/09 | Asset – MI | Redline - TX | Hire Redline to collect under false pretense of a debt |
| Mail | 2/8/09 | Redline – TX | Strohm - IN | Collection letter falsely stating debt owed to Asset |
| Mail | 6/7/09 | Redline – TX | Strohm – IN | Collection letter falsely stating debt owed to Asset |
| Mail | 10/1/09 | Asset – MI | Strohm - IN | Collection letter falsely stating debt owed to Asset |
| Mail | 12/10/09 | Lloyd & McDaniel – KY | Strohm – IN | Collection letter falsely stating debt owed to Asset |
| Mail | 10/1/11 | Asset – MI | Strohm - IN | Collection letter falsely stating debt owed to Asset |
| Mail | 2/27/12 | Lloyd & McDaniel – KY | Strohm – IN | Collection letter falsely stating debt owed to Asset |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Mail | 7/26/09 | Lloyd & McDaniel – KY | Monroe Sup Ct - IN | File complaint falsely stating debt owed to Asset |
| Mail | 11/12/13 | Lloyd & McDaniel – KY | Monroe Sup Ct - IN | File motion for proceedings supplemental |
| Wire | 11/20/13 | Asset – MI | US Court – IN | File proof of claim falsely stating a debt owed to Asset |
| Wire | 11/26/13 | Asset – MI | US Court – IN | File proof of claim falsely stating a debt owed to Asset |
| **Shaun Booker Communications** | | | | |
| Wire | 11/14/08 | Chase – NY | Asset – MI | Purchase of Shaun's NPI |
| Wire | 11/14/08 | Asset – MI | LRS – PA | Transfer of Shaun's NPI |
| Wire | 11/18/08 | Asset – MI | Experian – CA | False credit report that debt owed to Asset |
| Wire | 11/18/08 | Asset – MI | Equifax – GA | False credit report that debt owed to Asset |
| Wire | 11/18/08 | Asset – MI | TransUnion – IL | False credit report that debt owed to Asset |
| Wire | 12/17/12 | Asset – MI | Wright & Lerch –IN | Sent affidavit falsely stating that there is a debt owed to Asset; requesting pre- purchase interest; and signed without personal knowledge |
| **Lester Rogers Communications** | | | | |
| Wire | 5/13/10 | GE - CT | Asset - MI | Purchase of Lester's NPI |
| Wire | 5/13/10 | Asset – MI | LRS - PA | Transfer of Lester's NPI |
| Wire | 4/26/13 | Asset – MI | US Court – IN | File false proof of claim alleging a debt and pre-purchase interest |

43

**ANSWER:**     Defendants deny the allegations in ¶109.

110.     Some of the wire communications may have occurred between entities in the same state but upon information and belief crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication and that the Asset Entities have an office in Warren, MI and Tampa, FL and a tech office in New Freedom, PA.

**ANSWER:**     Defendants deny the allegations in ¶110.

111.     Each and every use of the U.S. Postal Service or interstate wires described above was committed by Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise), with the specific intent to defraud Plaintiffs, was committed for the purpose of obtaining the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, or promises. Defendants', through their agents, (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise), acts of mail and wire fraud in violation of 18 USC §§1341 and 1343 constitute "a pattern of racketeering activity" within the meaning of 18 USC §1961(1)(B).

**ANSWER:**     Defendants deny the allegations in ¶111.

112.     Plaintiffs justifiably relied on Defendants', (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise), fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Plaintiffs have suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment as more fully set forth above. Specifically, damage to their credit ratings, loss of money from bank levies and garnishments, judgment liens placed on property, harassing phone calls and letters, invasion of privacy, and payment of legal

defense fees was suffered as described in paragraphs 48-94. All Class members suffered similar loss.

**ANSWER:**   Defendants deny the allegations in ¶112.

### Interstate Transportation of Stolen Property

113.   Defendants devised and intended to devise a scheme or artifice to defraud and obtain Plaintiffs' money by false pretenses, representations or promises and transported or caused to be transported money in interstate commerce in the execution or concealment of the scheme or artifice to defraud in violation of 18 U.S.C. § 2314. In particular, Defendants through their agents (e.g. Asset, the members of the Law Firm Enterprise and members of the Collection Agency Enterprise), among other things, transported and caused to be transported in interstate money that belonged to Plaintiffs through voluntary and involuntary payments including bank freezes, garnishment, and bankruptcy claims and had a value in excess of $5,000.

**ANSWER:**   Defendants deny the allegations in ¶113.

114.   Millions of dollars obtained from voluntary and involuntary payments have been transferred via the mail and/or wire from Indiana to the Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) in Michigan.  These transactions are in the possession of Defendants and their agents.

**ANSWER:**   Defendants deny the allegations in ¶114.

115.   Interstate transportation of stolen property was an extension of the scheme to defraud as the wrongfully paid money from Plaintiffs to Defendants was transported out of the State of Indiana.

**ANSWER:**   Defendants deny the allegations in ¶115.

131087087v2 0956854

**Extortion**

116.   Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise), obstructed, delayed, or affected commerce and/or the movement of articles or commodities in commerce, by extortion or attempted or conspired to do so in violation of 18 U.S.C. §1951

**ANSWER:**   Defendants deny the allegations in ¶116.

117.   Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise),  obtained money and property from Plaintiffs, with their consent, induced by wrongful use of actual or threatened fear in the form of "sham" collection techniques including actual or threaten litigation. It is sham litigation in that there is no debt.

**ANSWER:**   Defendants deny the allegations in ¶117.

118.   Particularly, Defendants, through their agent Greene & Cooper, filed a lawsuit against Catherine Kuhn.  The Lawsuit falsely complained of a debt.

**ANSWER:**   Defendants deny the allegations in ¶118.

119.   The Kuhn lawsuit was particularly wrongful as Greene & Cooper sent the Complaint to the wrong address twice.  Defendants, through their agents, were aware the address was wrong and intended to exploit that knowledge to its financial advantage to be awarded an uncontested default judgment.  Kuhn feared that she would be lose monies or potentially put in jail for not paying and did not know how to respond since the Complaint looked legitimate. Kuhn retained legal counsel.  Booker did not know how to respond since the Complaint looked legitimate and fearing garnishment retained legal counsel.

**ANSWER:**   Defendants deny the allegations in ¶119.

46

120.    Further, failure to attend a Proceeding Supplemental is grounds for a court to issue a body attachment.  Strohm feared being garnished and potentially going to jail for an alleged debt and retained legal counsel.

**ANSWER:**    Defendants deny the allegations in ¶120.

121.    The Defendants scheme plays upon the Indiana consumers' fears of imprisonment for owing a debt as well as avoidance of garnishments and other asset seizures which results in voluntary payments and uncontested litigation.

**ANSWER:**    Defendants deny the allegations in ¶121.

## CLASS ACTION ALLEGATIONS

122.    This action is brought on behalf of the following four classes:

1.    The FDCPA Subclass consists of (i) all Indiana citizens (ii) whom were the subject of collection activity by the Defendants or Defendants' agents (iii) in an attempt to collect an alleged debt incurred for personal, family, or household purposes (iv) which were served with process or contacted in any matter by Defendants or Defendants' agents (v) during the one year period prior to the filing of this original complaint in this action through trial of this cause which are in violation of the FDCPA.

2.    The FDCPA Subclass consists of (i) all Indiana citizens (ii) whom were the subject of collection activity by the Defendants or Defendants' agents (iii) in an attempt to collect an alleged debt incurred for personal, family, or household purposes (iv) who had interest added retroactively by Defendants to the claimed amount of the alleged debt that had not been added by the alleged owner of the debt prior to purchase by Defendants (v) during the one year prior to the filing of this original complaint in this action through trial of this cause which are in violation of the FDCPA.

3.    The Rico Subclass consists of (i) all Indiana citizens (ii) who paid money to Defendants (iii) under Defendants scheme to defraud (iv) using the mail and/or wires; (v) and/or interstate transportation of stolen property; (vi) and/or extortion (vii) during the four year period prior to the filing of the original complaint in this action through the trial of this cause.

4.    The Restitution Subclass consists of (i) all Indiana citizens (ii) who paid money to Defendants (iii) in regard to an alleged debt owed to Defendants (iv) during the six year period prior to the filing of the original complaint in this action through the trial of this cause.

131087087v2 0956854

**ANSWER:**    Defendants admit that the Plaintiffs purport to represent the classes of individuals defined by ¶122, but Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶122.

123.    Plaintiffs allege that the class is so numerous that joinder of all members of the class is impractical as Defendants have filed thousands of cases and hold tens of thousands of consumer accounts in Indiana.

**ANSWER:**    Asset admits that its attorneys file lawsuits in Indiana for money that is owed to it.  Asset admits that consumers in Indiana owe it money.  However, Defendants deny that a class exists and deny that a class should be certified, and deny the remaining allegations contained in ¶123.

124.    There are questions of law or fact common to the classes, which common issues predominate over any issues involving only individual class members.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶124.

125.    The common factual issue common to the FDCPA Subclass is whether members were subject to collection activity by or on behalf of Asset Acceptance. The principal legal issue for the FDCPA Subclass is whether Asset Acceptance engaged in debt collection with no legal standing in violation of the FDCPA and whether Asset Acceptance engaged in charging pre-purchase interest.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶125.

131087087v2 0956854

126.    The common factual issue to the RICO Subclass is whether Asset Acceptance committed a scheme of fraud using the mail, wireless, telephone, faxes, and internet and/or interstate transportation of stolen property and/or extortion.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶126.

127.    The common factual issue common to the Restitution Subclass is whether Asset Acceptance received a monetary benefit from members. The principal legal issue for the Restitution Class is whether Asset Acceptance engaged in collection without legal standing and whether it would be inequitable for Asset Acceptance to retain the benefit without paying fair value for it, in violation of common law.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶127.

128.    Plaintiffs' claims are typical of those of the class members. All are based on the same facts and legal theories.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶128.

129.    Plaintiffs will fairly and adequately protect the interests of the classes.  Plaintiffs have retained counsel experienced in handling actions involving unlawful practices under the FDCPA and class actions. Neither Plaintiffs nor Counsel have any interest which might cause them not to vigorously pursue this action.

**ANSWER:**    Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶129.

49

130.     Certification of the classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

1.     The questions of law or fact common to the members of the class predominate over any questions affecting an individual member.

2.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**ANSWER:**     Defendants deny that a class exists, deny that a class should be certified, and deny the remaining allegations contained in ¶130 and its subparagraphs.

## CLAIMS FOR RELIEF

## COUNT I

## FAILURE TO ACTUALLY OWN
## THE DEBT IN VIOLATION OF THE FDCPA
## (AGAINST ALL DEFENDANTS )

131.     On behalf of FDCPA Subclass members, Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference as if all were set forth fully herein.

**ANSWER:**     Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.

132.     The FDCPA is a strict liability statute that is to be construed liberally so as to effectuate its remedial purpose.

**ANSWER:**     The allegations in ¶132 are a legal conclusion for which no response should be required.  To the extent a response is required, Defendants deny that the allegations in ¶132 accurately depict the full nature and purpose of the FDCPA.

133.     Asset Acceptance is precluded from relying on any *bona fide* error defense which relies upon a mistaken interpretation of the legal duties imposed by the FDCPA.

131087087v2 0956854

**ANSWER:**    Asset denies the allegations in ¶133.  To the extent that these allegations apply to the remaining Defendants, the remaining Defendants deny the allegations in ¶133.

134.    Asset Acceptance is strictly liable under the FDCPA upon a finding of a single violation of the Act.

**ANSWER:**    Asset denies the allegations in ¶134.  To the extent that these allegations apply to the remaining Defendants, the remaining Defendants deny the allegations in ¶134.

135.    The furnishing of a debt to a credit reporting agency by a debt collector is a communication to which the FDCPA applies.

**ANSWER:**    Asset denies the allegations in ¶135.  To the extent that these allegations apply to the remaining Defendants, the remaining Defendants deny the allegations in ¶135.

136.    All Defendants are a "debt collector" as the FDCPA defines a debt collector as any person who uses any instrumentality of interstate commerce, or the mails, the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, *directly* or *indirectly*, debts owed or asserted to be owed or due to another. 15 U.S.C. § 1692(a)(6).

**ANSWER:**    Defendants deny the allegations in ¶136.

137.    Under the FDCPA, "Debt" includes an "alleged obligation." 15 U.S.C. § 1692 a(5).

**ANSWER:**    Defendants admit that the allegations in ¶137 quote a small portion of definition of the word debt, but deny that it accurately and fully defines the word debt under the FDCPA and the purpose of the FDCPA.

138.    Each of the Asset Entities, as a purchaser or assignee of defaulted debt, is a debt collector under the FDCPA.

131087087v2 0956854

**ANSWER:**     Defendants deny the allegations in ¶138.

139.     All Defendants are liable for Asset Acceptance's actions because of *respondeat superior*.

**ANSWER:**     Defendants deny the allegations in ¶139.

140.     With respect to each class member, Asset does not legally own a debt, but solely possesses information and data about consumer transactions.

**ANSWER:**     Defendants deny the allegations in ¶140

141.     Defendants' actions violate 15 U.S.C. 1692 e of the FDCPA.

**ANSWER:**     Defendants deny the allegations in ¶141.

142.     Defendants' actions violate 15 U.S.C. §1 692 e(5), by making a "threat" to take an action that cannot legally be taken.

**ANSWER:**     Defendants deny the allegations in ¶142.

143.     Defendants' actions violate 15 U.S.C. 1692 e (2)(A) of the FDCPA by falsely representing the "character, amount, or legal status" of a non-existent debt.

**ANSWER:**     Defendants deny the allegations in ¶143.

144.     Defendants' actions violate 15 U.S.C. 1692 e (10) of the FDCPA.

**ANSWER:**     Defendants deny the allegations in ¶144.

145.     Defendants' actions violate 15 U.S.C.1692 f of the FDCPA.

**ANSWER:**     Defendants deny the allegations in ¶145.

146.     Defendants' actions violate 15 U.S.C. 1692 f (1) of the FDCPA.  Because Asset has no legal ownership of a debt and as such has no agreement expressly authorizing collection amounts including interest.

**ANSWER:**     Defendants deny the allegations in ¶146.

131087087v2 0956854

## COUNT II

### FAILURE TO OBTAIN A DEBT COLLECTION LICENSE AS MANDATED BY I.C. 25-11-1 -7 IN VIOLATION OF THE FDCPA

Paragraphs 147- 154.

**ANSWER:**    The Court dismissed this Count, so no response is required.

## COUNT III

### CHARGING PRE-PURCHASE INTEREST THAT HAD BEEN WAIVED BY THE ASSIGNOR IN VIOLATION OF THE FDCPA

#### (Against All Defendants)

155.    On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein. Substance prevails over form.

**ANSWER:**    Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.  It also should be noted that this count has been dismissed against all Plaintiffs' except Mr. Rogers.

156.    The originator as servicer is required to send a periodic statement on all accounts, including charged-off accounts, for any period during which interest or fees are added to the account.  Regulation Z, 12 C.F.R. § 226.5(b)(2)(i), "A periodic statement need not be sent for an account if the creditor deems it uncollectible, if delinquency collection proceedings have been instituted, [or] if the creditor has charged off the account in accordance with loan-loss provisions and will not charge any additional fee or interest on the account …").

**ANSWER:**    The allegations in ¶156 are a legal conclusion for which no response should be required.  To the extent a response is required, Defendants deny the allegations in ¶156.

131087087v2 0956854

157.    The originator as servicer quit sending billing statements after charge off which implied the bank waived the right to charge interest post charge off and Asset Acceptance could only take what the bank as assignor could give.  Therefore, since the assignor waived the right to add interest, Asset Acceptance acquired the data subject to that waiver

**ANSWER:**    Defendants deny the allegations in ¶157.

158.    Despite the above, Asset Acceptance represented that Asset has the right to add interest for the period between charge-off and purchase.

**ANSWER:**    Asset admits that it has the legal right to charge interest between charge-off and purchase, but, denies the remaining allegations in ¶158 and incorporates its responses from above.

**ANSWER:**    The remaining Defendants only acquired knowledge regarding these allegations based upon their investigation after the filing of this complaint. The remaining Defendants adopt the answer provided by Asset.

159.    As describe in paragraphs 57-79, the collection activity on Casel's and Rogers' data included the demand for interest prior to Asset's purchase.

**ANSWER:**    Defendants deny the allegations in ¶159.

160.    All this despite, the bank from which Asset purchased from did not charge interest after the charge off.

**ANSWER:**    Defendants deny the allegations in ¶160 because not all of the accounts came from a bank.

161.    Defendants' actions violate 15 USC 1692e of the FDCPA.

**ANSWER:**    Defendants deny the allegations in ¶161.

162.    Defendants' actions violate 15 USC 1692e (2)(A) of the FDCPA.

54

**ANSWER:**      Defendants deny the allegations in ¶162.

163.    Defendants' actions violate 15 USC 1692e (5) of the FDCPA.

**ANSWER:**      Defendants deny the allegations in ¶163.

164.    Defendants' actions violate 15 USC 1692e (10) of the FDCPA.

**ANSWER:**      Defendants deny the allegations in ¶164.

165.    Defendants' actions violate 15 USC 1692f of the FDCPA.

**ANSWER:**      Defendants deny the allegations in ¶165.

166.    Defendants' actions violate 15 USC 1692f (1) of the FDCPA.

**ANSWER:**      Defendants deny the allegations in ¶166.

167.    Defendants' actions violate 1692g (a)(1) of the FDCPA for failure to disclose interest accrual.

**ANSWER:**      Defendants deny the allegations in ¶167.

## COUNT IV

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. § 1962(C)
## (DEFENDANTS AACC, ASSET, AARS, LRS, AND ENCORE)

168.    Plaintiffs reallege and restate paragraphs 1 through 167.

**ANSWER:**      Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.

169.    AACC, Asset, AARS, LRS, and Encore are hereinafter referred to as the "RICO Defendants."

**ANSWER:**      Defendants admit that Plaintiffs hereinafter will refer to them as the RICO Defendants, but they deny that Plaintiffs have a RICO claim

131087087v2 0956854

170.     The following legal entities (or any combination thereof) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact": Asset, AARS, and LRS ("Asset Collection Enterprise").

a.     AACC is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of the Asset Collection Enterprise's affairs.

b.     Asset, AARS, and LRS share the common purpose of (among other things) defrauding members of the plaintiff class of money or property.

c.     Asset, AARS, and LRS are related in that they are all involved in the operation and management of collections on behalf of Asset Acceptance.

d.     The Asset Collection Enterprise possesses sufficient longevity for the members to carry out their purpose(s) in that the Asset Collection Enterprise has existed since September 2002 and continues to operate to the present (at a minimum).

e.     Since September 2002 and continuing to the present, AACC has conducted, participated in, engaged in, and operated and managed the affairs of Asset, AARS, or LRS through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). AACC's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**     Defendants deny the allegations in ¶170 and its subparagraphs a through e.

171.     In the alternative to paragraph 170, Asset, AARS, and LRS are each a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§1961(4) & 1962(c).

a.     AACC is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of Asset's, AARS's, or LRS's affairs.

b.     Since September 2002 and continuing to the present, AACC has individually conducted, participated in, engaged in, and operated and managed the affairs of the Asset, AARS or LRS through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  AACC's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, supra), interstate

131087087v2 0956854

transportation of stolen property (as described in paragraphs113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**<u>ANSWER</u>:**   Defendants deny the allegations in ¶171 and its subparagraphs a and b.

172.   In the alternative to paragraphs 170-172, Asset is a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).

    a.   AACC is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of Asset's affairs.

    b.   Since September 2002, and continuing to the present, AACC has conducted, participated in, engaged in, and operated and managed the affairs of Asset through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Asset's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 66-138, *supra*), interstate transportation of stolen property (as described in paragraphs 139-141, *supra*), and extortion (as described in paragraph 142-146, *supra*).

**<u>ANSWER</u>:**   Defendants deny the allegations in ¶172 and its subparagraphs a and b.

173.   The following legal entities (or any combination thereof) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact": AACC, Asset, AARS, and LRS ("Asset Group Collection Enterprise").

    a.   Encore is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of the Asset Group Collection Enterprise's affairs.

    b.   AACC, Asset, AARS, and LRS share the common purpose of (among other things) defrauding members of the plaintiff class of money or property.

    c.   AACC, Asset, AARS, and LRS are related in that they are all involved in the operation and management of collections on behalf of Asset Acceptance.

    d.   The Asset Group Collection Enterprise possesses sufficient longevity for the members to carry out their purpose(s) in that the Asset Group

Collection Enterprise has existed since September 2002 and continues to operate to the present (at a minimum).

e.  Since June 2013 and continuing to the present, Encore has conducted, participated in, engaged in, and operated and managed the affairs of Asset, AARS, or LRS through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Encore's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**   Defendants deny the allegations in ¶173 and its subparagraphs a through e.

174.   In the alternative to paragraph 173, AACC, Asset, AARS, and LRS are each a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).

**ANSWER:**   Defendants deny the allegations in ¶174.

175.   In the alternative to paragraphs 173-174, Asset is a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).

a.  Encore is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of Asset's affairs.

b.  Since June 2013 and continuing to the present, Encore has conducted, participated in, engaged in, and operated and managed the affairs of Asset through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Asset's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**   Defendants deny the allegations in ¶175 and its subparagraphs a and b.

176.   AARS is a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).

a.   Asset is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of AARS's affairs.

b.   Since December 2010 and continuing to the present, Asset has conducted, participated in, engaged in, and operated and managed the affairs of AARS through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Asset's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**   Defendants deny the allegations in ¶176 and its subparagraphs a and b.

177.   LRS is a legal entity that constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).

a.   Asset is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of LRS's affairs.

b.   Since July 2010 and continuing to the present, Asset has conducted, participated in, engaged in, and operated and managed the affairs of LRS through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Asset's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**   Defendants deny the allegations in ¶177 and its subparagraphs a and b.

178.   In the alternative to paragraphs 170-177, the Law Firm Enterprise is an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that its members are "a group of individuals associated in fact".

a.   Each RICO Defendant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of the Collection Agency Enterprise's affairs.

b.  The Members of the Law Firm Enterprise share the common purpose of (among other things) carrying out the RICO Defendants' scheme to defraud members of the plaintiff class of money or property.

c.  The Members of the Law Firm Enterprise are related in that they all employed by AACC to collect debt through litigation-related collection activities on behalf of Asset Acceptance.

d.  The Law Firm Enterprise possesses sufficient longevity for the members to carry out their purpose(s) in that the Law Firm Enterprise has existed since September 2002 and continues to operate to the present (at a minimum).

e.  Since September 2002 and continuing to the present, each RICO Defendant has conducted, participated in, engaged in, and operated and managed the affairs of the Law Firm Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Each RICO Defendant's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, supra), interstate transportation of stolen property (as described in paragraphs 113-115, supra), and extortion (as described in paragraph 116-121, supra).

**ANSWER:**   Defendants deny the allegations in ¶178 and subparagraphs a through e.

179.   In the alternative to paragraphs 170-178, the Collection Agency Enterprise is an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that its members are "a group of individuals associated in fact",

a.  Each RICO Defendant is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of the Collection Agency Enterprise's affairs.

b.  The Members of the Collection Agency Enterprise share the common purpose of (among other things) carrying out the RICO Defendants' scheme to defraud members of the plaintiff class of money or property.

c.  The Members of the Collection Agency Enterprise are related in that they all employed by AACC to collect debt through traditional collection activities on behalf of Asset Acceptance.

d.  The Collection Agency Enterprise possesses sufficient longevity for the members to carry out their purpose(s) in that the Collection Agency Enterprise has existed since September 2002 and continues to operate to the present (at a minimum).

60

e.   Since September 2002 and continuing to the present, each RICO Defendant has conducted, participated in, engaged in, and operated and managed the affairs of the Collection Agency Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). Each RICO Defendant's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraph 116-121, *supra*).

**ANSWER:**   Defendants deny the allegations in ¶179 and its subparagraphs a through e.

180.   At all relevant times, the enterprises alleged in paragraphs 168 -179 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

**ANSWER:**   Defendants deny the allegations in ¶180.

181.   All of the acts of racketeering described in paragraphs 168-179 (*supra*) were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud the plaintiff class members of money and property, their common result was to defraud the plaintiff class members of money and property; each RICO Defendant, personally or through his/its agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; consumers whose debt information had been acquired by the RICO Defendants were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

**ANSWER:**   Defendants deny the allegations in ¶181.

182.   All of the acts of racketeering described in paragraphs 168-181 (*supra*) were continuous so as to form a pattern of racketeering activity in that the RICO Defendants engaged in the predicate acts over a substantial period of time or in that the RICO Defendants' acts of racketeering are the regular way in which the RICO Defendants have done and continue to do business and threaten to continue indefinitely.

**ANSWER:**   Defendants deny the allegations in ¶182.

183.   As a direct and proximate result of, and by reason of, the activities of the RICO Defendants, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent their money or property was subject to bank freeze, judicial liens, garnishments, lower credit ratings, hiring of legal counsel to defend, and payments based fraudulent pretenses. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

**ANSWER:**   Defendants deny the allegations in ¶183.

**COUNT V**

**RICO CONSPIRACY - 18 U.S.C. § 1962(D)**
**(DEFENDANTS AACC, ASSET, AARS, LRS, AND ENCORE)**

184.   Plaintiffs reallege and restate paragraphs 1 through 183.

**ANSWER:**   Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.

185.   To the extent some of the RICO Defendants are liable as conspirators under 18 U.S.C. § 1962(d), Count V is pled in the alternative to Count VI.

**ANSWER:**   Defendants deny the allegations in ¶185.

186.   As alleged in Count VI, some or all of the RICO Defendants violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity. These Defendants are hereinafter referred to as "Operators and Managers."

**ANSWER:**   Defendants deny the allegations in ¶186.

131087087v2 0956854

187.    To the extent some RICO Defendants are found to have not violated section 1962(c) as Operators and Mangers, those RICO Defendants conspired with the Operators and Managers and thereby violated of 18 U.S.C. § 1962(d).  These RICO Defendants are hereinafter referred to as the Conspirators.

**ANSWER:**    Defendants deny the allegations in ¶187.

188.    In particular, the Conspirators intended and agreed to further or facilitate an endeavor of the Operators and Managers which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating that criminal endeavor.

**ANSWER:**    Defendants deny the allegations in ¶188.

189.    Plaintiffs were injured by the Conspirators' overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud (as described in paragraphs 48-112, *supra*), interstate transportation of stolen property (as described in paragraphs 113-115, *supra*), and extortion (as described in paragraphs 116-121, *supra*).

**ANSWER:**    Defendants deny the allegations in ¶189.

190.    As a direct and proximate result of, and by reason of, the activities of the Conspirators, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent their money or property was subject to bank freeze, judicial liens, garnishments, lower credit ratings, hiring of legal counsel to defend, and consensual payments based upon fraudulent pretenses.  Plaintiffs are, therefore, entitled to

131087087v2 0956854

recover threefold the damages they sustained together with the cost of the suit, including

costs, reasonable attorneys' fees and reasonable experts' fees.

**ANSWER:**   Defendants deny the allegations in ¶190.

## COUNT VI

## INDIANA COMMON LAW ACTUAL FRAUD
## (DEFENDANTS AACC, ASSET, AARS, LRS, AND ENCORE)

191.   On behalf of Restitution Subclass members, Plaintiffs now re-allege each and

every allegation as set forth above, and hereby incorporate same by references as if all were set

forth fully herein.

**ANSWER:**   Defendants adopt and incorporate its responses to the above paragraphs

though they are fully set forth herein.

192.   Defendants, through their agents (e.g. Asset, members of the Law Firm

Enterprise, members of the Collection Agency Enterprise), in each and every furnishing of an

alleged debt to a credit reporting agency, in each and every communication to its collection

agency subcontractors, on each and every dunning letter sent by Asset or its agents, and in each

and every lawsuit filed on Asset's behalf in Indiana with Defendants' knowledge, made the

material misrepresentation that a valid debt owed to Asset existed including pre-purchase interest

owed to Asset as described in paragraphs 48-112.

**ANSWER:**   Defendants deny the allegations in ¶192.

193.   Defendants, through their agents (e.g. Asset, members of the Law Firm

Enterprise, members of the Collection Agency Enterprise) intended to defraud Indiana

consumers and intended that Indiana consumers would rely upon their false representations.

**ANSWER:**   Defendants deny the allegations in ¶193.

194.    Tens of thousands of Indiana consumers justifiably and detrimentally relied upon Defendants, through their agents' (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) false statements, including Plaintiffs as described in Paragraphs 48-112.

**ANSWER:**    Defendants deny the allegations in ¶194.

195.    Tens of thousands of Indiana consumers were directly injured by reason of Defendants, through their agents' (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) false statements, including Plaintiffs as described in Paragraphs 48-112 which included payment of legal fees and damage to credit scores.

**ANSWER:**    Defendants deny the allegations in ¶195.

196.    The named Plaintiffs, individually and on behalf of Indiana consumers, allege that each of the Defendants were the agents, representatives, servants, employees, principals, joint-venturers, co-conspirators, and/or representatives of each of their codefendants and were acting within the course and scope of their agency, employment, joint-venture, conspiracy, and/or service with the approval, knowledge, authority, acquiescence, and/or ratification of each of the remaining Defendants and, therefore, to the extent that any Defendant did not directly engage in the actions upon which this Count is based, such Defendant should be equally liable for the resulting damages as the defendants who performed such actions.

**ANSWER:**    Defendants deny the allegations in ¶196.

197.    Indiana consumers who are class members are entitled to monetary damages to fairly and adequately compensate them for the injuries and damages sustained by reason of Defendants' fraud.

**ANSWER:**    Defendants deny the allegations in ¶197.

131087087v2 0956854

198.    In committing the acts of fraud, Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) have acted intentionally, outrageously, oppressively, despicably, fraudulently, and maliciously in conscious disregard of the Plaintiffs' rights and welfare in contravention of Indiana law and public policy. As a result thereof, Plaintiffs are entitled to exemplary and punitive damages in an amount sufficient to properly punish and deter Defendants in an amount to be proven at trial.

**ANSWER:**    Defendants deny the allegations in ¶198.

199.    With respect to each class member, a fraudulent statement was made by Defendants through their agent (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) that Asset was owed a debt.  Asset was not owed a debt, because it only purchased data about consumer transactions. Despite this, Defendants through their agent (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) repeatedly represented that Asset was owed a debt in all communications related to its collection activities.

**ANSWER:**    Defendants deny the allegations in ¶199.

200.    The wrongful acts and false representations made by Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) should be imputed to each and every Defendant under the theories of agency, alter ego, veil-piercing, and *respondeat superior*.

**ANSWER:**    Defendants deny the allegations in ¶200.

## COUNT VII
## RESTITUTION

## (DEFENDANTS AACC, ASSET, AARS, LRS, AND ENCORE)

201.    Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.

**ANSWER:**    Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.

202.    A member of the Restitution class conferred a benefit on the Defendants; more specifically a payment towards an alleged debt owned by Asset.

**ANSWER:**    Defendants deny the allegations in ¶202.

203.    The Plaintiffs claims have the same essential characteristics and arise from the same fraudulent conduct as a plaintiff who actually paid monies to Defendants.

**ANSWER:**    Defendants deny the allegations in ¶203.

204.    Defendants have knowledge of the benefit (i.e. the money paid by each respective consumer towards the alleged Asset debt).

**ANSWER:**    Defendants deny the allegations in ¶204.

205.    Defendants have accepted or retained the benefits conferred (i.e. the above-referenced payment).

**ANSWER:**    Defendants deny the allegations in ¶205.

206.    Without the Defendants', through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) false pretense that Asset was owed a debt, a reasonable consumer would not pay monies to an entity that bought only data about past transactions, but did not own any debt owing from the consumer.

**ANSWER:**    Defendants deny the allegations in ¶206.

131087087v2 0956854

207.    The circumstances are such that it would be inequitable for Defendants to retain the benefit of the millions of dollars that they wrongfully collected from Indiana consumers.

**ANSWER:**    Defendants deny the allegations in ¶207.

## COUNT VIII
## UNJUST ENRICHMENT

### (DEFENDANTS AACC, ASSET, AARS, LRS, AND ENCORE)

208.    On behalf of Restitution Subclass members Plaintiffs now re-alleges each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein. Substance prevails over form.

**ANSWER:**    Defendants adopt and incorporate its responses to the above paragraphs though they are fully set forth herein.

209.    Plaintiff alleges that the Defendants have unjustly retained a benefit to the Plaintiffs' detriment, and that Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

**ANSWER:**    Defendants deny the allegations in ¶209.

210.    Plaintiffs have suffered a detriment - monies paid & damage to their credit report, as described in Paragraphs 48-112. The Plaintiffs claims have the same essential characteristics and arise from the same fraudulent conduct as a plaintiff who actually paid monies to Defendants.

**ANSWER:**    Defendants deny the allegations in ¶210.

211.    Plaintiffs' detriment has a connection between the detriment and the Defendants' retention of the benefit.

**ANSWER:**    Defendants deny the allegations in ¶211.

212.    The Defendants' retention of Plaintiffs' monies is a detriment to Plaintiffs.

131087087v2 0956854

**ANSWER:**     Defendants deny the allegations in ¶212.

213.    Plaintiffs would have acted differently, had they known Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) had no standing to file a lawsuit or engage in any other collection as a result of Defendants' failure to be licensed, lack of a debt, and legal ownership of the alleged debt.

**ANSWER:**     Defendants deny the allegations in ¶213.

214.    The transfer of money from Plaintiff to Defendants, through their agents (e.g. Asset, members of the Law Firm Enterprise, members of the Collection Agency Enterprise) in exchange for paying off alleged debt violated the fundamental principles of justice, equity and good conscience so the Defendants' continued retention of money is a detriment.

**ANSWER:**     Defendants deny the allegations in ¶214.

215.    The acts of Defendants complained of herein constitute unjust enrichment of Defendants at Plaintiff's expense in violation of the common law of Indiana.

**ANSWER:**     Defendants deny the allegations in ¶215

216.    Plaintiffs are entitled to disgorgement of ill-gotten gains in an amount to be proved at trial.

**ANSWER:**     Defendants deny the allegations in ¶216.


**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

For their First Affirmative Defense, Defendants state in the alternative, that if the FDCPA does apply, that any violation of the FDCPA, which Defendants deny, was not intentional and would have resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

131087087v2 0956854

## SECOND AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over Defendants Asset Acceptance Capital Corp., Asset Recovery Services, LLC, Legal Recovery Solutions, LLC, and Encore Capital Group Inc..

## THIRD AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' FDCPA claims are barred by the FDCPA's one year statute of limitations, which begins to run on the date of the alleged violation.  15 U.S.C. §1692k.

## FOURTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' claims are barred by either judicial or collateral estoppel.

## FIFTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' claims are barred by the doctrine of waiver.

## SIXTH AFFIRMATIVE DEFENSE

All of the alleged state law claims are by the litigation privilege.

## SEVENTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' alleged state law claims should be barred as they amount to compulsory counterclaims.

## EIGHTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine.

## NINTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' claims are barred by *Res Judicata*.

## TENTH AFFIRMATIVE DEFENSE

If one or more of the Plaintiffs made a payment to any of the Defendants, which the Defendants deny, such a Plaintiff's claim for a return of those monies is barred by the voluntary payment doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE

One or more of the Plaintiffs' claims are barred by the statute of limitations.

131087087v2 0956854

Dated: June 26, 2015

Respectfully submitted on behalf of,

Defendants, Asset Acceptance Capital Corp., Asset Acceptance LLC, Asset Acceptance Recovery Services LLC, Legal Recovery Solutions LLC, and Encore Capital Group Inc.

By: /s/ *John P. Ryan*
    One of Their Attorneys

David M. Schultz
John P. Ryan
Jennifer Kalas
Katherine H. Tresley
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, IL 60601-1081
(312) 704-3000
Fax:  (312) 704-3001
dschultz@hinshawlaw.com
jryan@hinshawlaw.com
jkalas@hinshawlaw.com
ktresley@hinshawlaw.com

131087087v2 0956854

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all Counsel of record via the Court's electronic filing system.

s/John P. Ryan
Hinshaw & Culbertson LLP
222 N. LaSalle St., Suite 300
Chicago, IL  60601-1081
Tel:    312/704-3000
Fax:    312/704-3001

131087087v2 0956854